Bissell, P. J.,
delivered the opinion of the court.
In the statement of what is requisite to an apprehension of the suit and to an application of the law which we conclude *324 must control its decision, we shall very closely adhere to the fkcts recited in the findings of the court. They may be occasionally supplemented by our own conclusions respecting some matters, but in no instance will there be any departure from what the trial court has stated. The force and effect of these findings are thoroughly settled. As a general proposition, parties are not entitled to attack a judgment on the claim that it is unsupported by the evidence. Wherever the controversy, in its important and essential features, rests on conflicting testimony, the appellant must be able to demonstrate error of law to maintain his appeal. Nevertheless, we have read this very voluminous record, and while we are compelled to affirm the judgment, notwithstanding our conclusion that there is enough in the case to show that, under some circumstances and with proper parties, what was done by the appellee, Chappell, would subject him to legal responsibility, we are satisfied the trial court did not err in its conclusions respecting some facts which we deem decisive of the action.
In 1887, The Cincinnati-Colorado Coal, Coke and Iron Company, which is designated in the evidence and will be hereafter referred to as the Four C Company, was the owner of some lands in Las Animas county. They were coal lands, and apparently had been somewhat developed by that corporation. The company had not reached a paying basis and was without sufficient capital to proceed with the satisfactory development of the mines. At this time, the appellant, Beshoar, with some other persons, was the owner of the capital stock of the Four C Company. On behalf of his company he entered into negotiations with Chappell which looked to the organization of a new corporation on a basis which would permit funds to be raised to open up the property. The parties concluded the thing was feasible, and Chappell organized a new company called The Grey Creek Coal and Coking Company. The capital stock of this latter corporation was two thousand shares of one hundred dollars each. This new company was organized by the election of officers and a board *325 of directors, and then received from Beshoar, on behalf of himself and the stockholders of the Four C Company, a written proposition which substantially was that the Four C Company would sell to the Grey Creek Coal and Coking Company their real estate, which was described in the proposition, for one thousand shares of the capital stock of the company. In the proposition nothing whatever was said in regard to the remaining thousand shares. The evidence, however, discloses that it was in the contemplation of the parties that the thousand shares of stock should be sold at sixty cents on the dollar to produce a development fund of sixty thousand dollars, which should be devoted to opening up the property. Evidently the stockholders of the Four C Company were willing to surrender one half of their holdings for this purpose, and in place of cancelling, transferring or surrendering any of the Four C Company’s stock, pursued this plan. There were some limitations of time which were to control Chappell in his scheme to float the new company, but this is not important to the dispute. This proposition was submitted at a directors’ meeting, held on the 22d of September, 1887. It was accepted, and what was done by the Grey Creek Company will be assumed to be enough to secure them in their legal rights. The project was carried out by the Four C Company, which conveyed the lands to the other corporation. The capital stock of the Grej1- Creek Company was issued, nine hundred shares of it went to Beshoar, according to the arrangement, one hundred which he had agreed to give Chappell for his services in the premises were turned over to him, and the remaining thousand shares were left for sale to raise the development fund. The trial court finds that this thousand shares of stock was sold by Chappell for sixty thousand dollars in cash, which went into the treasury of the company, and was applied by its officers and directory to the development of the lands which had been transferred. In stating this fact, we do not express our opinion concerning its just-mess. We expressly decline to yield our assent to the result respecting this matter, for we desire that the affirmance shall *326 not extend so far as to conclude anjr parties in any subsequent litigation which may be instituted regarding it. The stock was deposited in the First National Bank of Trinidad, subject to sale and payment of the subscription price, and when the whole sum of sixty thousand dollars was paid in and properly applied, the stock was turned over to the purchasers. The court finds the money was actually put into the development of the property. To illustrate the animus and modus, we must now state what is really the occasion of the suits. On the 26th of September, a written agreement was entered into between The Colorado Coal and Iron Company and Chappell, which need only be stated to disclose the hidden motives. It was recited therein that Chappell had procured from Beshoar and others an option on a controlling interest in the stock of the Grey Creek Company, and he undertook to obtain from that company a lease of the estate for a term of twenty years on sundry conditions. The only one of importance is that which looked to the expenditure of money for the development of the property. The Colorado Coal and Iron Company undertook to spend sixty thousand dollars for this purpose. It will be observed there was a very strange coincidence between the amount which The C. C. & I. Co. agreed to spend and the sum for which Chappell undertook to sell the Grey Creek Company’s stock. The evidence likewise disclosed that as fast as money was disbursed by him as an officer of the Grey Creek Company in payment of the bills which were incurred in the development, these vouchers were turned over to the manager of The C. C. & I. Co., who honored them by checks of that corporation for their face value. It thus resulted that what Chappell paid out with bis right hand for the Grey Creek Company he instantly got back in his left from The C. C. & I. Co. On the 27th of September, which was the day following the execution of the agreement between Chappell and The C. C. & I. Co., the Grey Creek Company and The C. C. & I. Co. made an agreement of a lease which contained the provisions and various conditions specified in the agreement bet ween. Chappell and *327 that corporation. It was executed by the lessors, through Chappell, the vice president, and by the proper officers on behalf of The C. C. & I. Co. Under the provisions of this lease, The C. C. & I. Co. spent sixty thousand dollars, opened up the property, paid royalties from time to time, but in the end suspended operations.
The transaction concerning this stock is not creditable to the appellee, Chappell, and we cannot close our mental vision to what is so evident from the record that the scheme was one cunningly devised for the appropriation without cost to.him of one half of the capital stock of the Grey Creek Company. This in no wise militates against what we said at the outset concerning the force of the court’s conclusion on matters of fact, because our.opinion in no wise affects the legal result which we have reached. We have simply given expression to our doubts respecting this matter, for, if the thing be possible, we desire to so far leave the matter open that the Grey Creek Company may ultimately be able to establish and enforce its rights. We have stated enough to show the alleged basis for the suits which Beshoar afterwards brought. Beshoar claims that for a long time he was ignorant of the situation, and without knowledge of what Chappell had done with reference to the disposition of the Grey Creek Company’s stock, and was uninformed concerning this contract between The C. C. & I. Co. and Chappell. There was a change in the management of The C. C. & I. Co., and in the investigations which followed it, this agreement between Chappell and the company came to the surface, and Beshoar learned of it. How little or how much he knew before of the transaction is not easily ascertained from the testimony. The record shows the lease to The C. C. & I. Co. was made in February, 1.888, and shortly thereafter that company went into possession of the property, and engaged in its development. Beshoar knew of the lease, and had frequent conferences with Chappell concerning its terms. Whether he had any other information which should have advised him concerning the exact nature of the transaction is not apparent. *328 He was not told of this contract between Chappell and The C. C. & I. Co., nor did he learn of it until about the middle of 1890, when he was fully advised concerning its existence and its terms. After the resurrection of this agreement, Beshoar and The C. C. & I. Co. made an arrangement to start a litigation to hold Chappell responsible for what he had done, and establish Beshoar’s rights as a stockholder, for the benefit both of Beshoar and The C. C. & I. Co. The arrangement which was made provided substantially for the advancement to Beshoar of six thousand dollars, or, at all events, he was in some way to receive that amount of money, and The C. C. & I. Co. undertook the prosecution of such suits as might be necessary to establish Beshoar’s rights. The C. C. & I. Co. were to pay all costs, furnish an attorney, and, in general, maintain the prosecution. Thereupon, three suits were begun. The first we will call “ 3209,” the second “ 3362,” which are cases by Beshoar against divers defendants, and the third “3218,” which is the Grey Creek Company against Beshoar and MacKenzie. We will only state enough of the purposes of these actions,to illustrate their scope and the object of the pleader. In the first, Beshoar charged that Chappell had sold one thousand shares of stock and appropriated the proceeds to his own use ; further, that he had issued other stock and disposed of it, appropriating the results of the sales. In “ 3362,” Beshoar charged that all the stock which had been issued, other than that which had come to him, had been issued without any consideration whatever, and was fraudulent and void in the holder’s hands, and he sought to have it cancelled, thereby increasing the value of his own holdings. In “ 3218,” the Grey Creek Company charged that some certificates of stock had been irregularly issued, and had illegally come into the possession of Beshoar, and his refusal to surrender them for cancellation. The company prayed a decree that Beshoar be compelled to surrender them for destruction. All these three suits were ultimately consolidated and tried as one case. There was no rule compelling the parties to replead, nor *329 were the issues in the several suits in any wise changed by the order. Nothing farther need be stated concerning the object of the suits, or the general averments of the various pleadings. This much further must be stated, because it is of great gravity and importance in forcing the result. It will be observed nothing has been said concerning any statement in the pleadings as to the reason why the suit was brought by Beshoar, and why it was not brought by the Grey Creek Company against Chappell. It is very evident, as a general proposition, that if Chappell had sold the stock of the company while acting as an officer or director of it, or had appropriated the proceeds of it while acting in any such capacity, he would be liable to answer to the company for whatever he might have received. It is equally true, if he had issued the stock without consideration, and the stock had ultimately come back into his possession, the company would have had the legal right to compel its surrender and cancellation on making out a proper case. Beshoar was a stockholder, and, to the extent of his holding, interested in the affairs, management and prosperity of the new company. His rights as a stockholder need not be here discussed, but they are referred to in this manner to emphasize the omission in his pleading. There is nothing in either of the complaints which he filed showing a demand on the officers of the Grey Creek Company with reference to the enforcement of the corporate rights, nor did he, as plaintiff, allege, in either one of the suits, anything which might operate by way of excuse for the omission of this request. There is nothing to show an attempt to secure action by the officers or board of directors of the company, or concurrent action with the other Stockholders to compel those people to proceed. The twenty-first finding of fact is very specific and direct on this point. It likewise demonstrates that the directors of the Grey Creek Company, other than Chappell, were in no manner connected with the contract which Chappell had made with The C. C. & I. Co., and were perfectly free to act as they might be advised for the protection of the stockholders of the corporation *330 ■which they represented. We quite concur with the court in its conclusion that the evidence does not show any such condition of affairs respecting the management and directory of the Grey Creek Company as tends to excuse the stockholder from preferring a request for corporate action.
What has been stated suggests the only two propositions which we deem it essential to discuss or decide. The first respects the interest in which the litigation is being prosecuted, and the second is the failure of the plaintiff to either plead or prove a cause of action on his behalf as a stockholder. If this litigation had been honestly instituted by a stockholder for the protection of his and other stockholders’ rights, and was not so evidently a suit instigated by a rival company for its own interests, we should strive to be astute to discover some remedy for a very evident wrong. The far reaching and flexible nature of equitable powers might, with proper proof and under other circumstances, enable us to do justice as between the stockholders of the Grey Creek Company and Chappell, its officer and director. But we have no inclination to struggle for this result, because it is a well settled principle that whenever it is made to appear that the suit was .not begun in good faith by a shareholder for the protection of his rights, but was in reality originated and prosecuted by another corporation for its own benefit, the court will consider what led the plaintiff to institute his suit, and, finding some other reason than a desire to protect stockholders’ rights, will refuse to entertain the bill. Forrest v. Manchester, etc., R'way Co., 4 De G., F. & J. 19 (65 Eng. Chan., 125); Filder v. London, etc., R'way Co., 1 H. & M. 489; Belmont v. Erie R'way Co. et al., 52 Barb. 637; Waterbury v. The Merchants’ Union Express Co., 50 Barb. 157; Camblos v. The P. & R. R. R. Co., 4 Brewster, 563.
Naturally, the cases respecting this proposition are limited, since the question could not often arise. It seldom happens that shareholders, otherwise than for the protection of their own interests, come into courts of equity to seek redress for wrongs done the corporation of which they are *331 members. But wherever it is apparent that this has been done, the courts have never hesitated to send the plaintiff out of court and refuse him relief. In enforcing the doctrine, the courts do not attempt to balance the relative advantages to the plaintiff stockholder, or to the company which has assumed the burden of the litigation, for some benefit which they expect to derive from the judgment. It is enough that another company directs the suit and pays the costs. It would be very easy to demonstrate that in this particular litigation the balance of advantage accrued to The C. C. & I. Co., which is the controlling spirit in this litigation. The agreement which they entered into with Beshoar would give them control of a majority of the stock of the Grey Creek Company, and render it possible for them to enforce the .agreement which they had made with Beshoar to secure a new lease on the Grey Creek property at a very large reduction in the rental. The property must have been of value to them, and the lease a gain, or the contract would never have been made. It may be conceded that Beshoar would likewise have been benefited, if either of his two suits had been successful. In the one case a large amount of money would go into the treasury of the Grey Creek Company, and he would be entitled to his proportionate share of it; and in the other he would become substantially the only stockholder, and would therefore reap very much greater ultimate benefit than would have come to him if the total issue of two thousand shares was adjudged valid. We are not permitted to speculate about where the preponderating interest lies. It would be a disadvantage to the Grey Creek Company, as a corporation, to reduce the rental which they were entitled to receive for the use and occupancy of their property. This benefit would have inured to The C. C. & I. Co., which controls the litigation, and these two facts forbid this stockholder to maintain his present suit.
The other consideration is equally fatal. The plaintiff was without capacity to maintain the suit. It is too late now to insist that a stockholder as such is never without the right *332 to file a bill for the protection of his interests, or even for the redress of what may be termed a corporate wrong. In the increasing diversity of corporate organizations, it not infrequently happens that the control and management of their affairs fall into the hands of unscrupulous persons, who do not hesitate to use the corporate powers to their personal advantage, and to the destruction of the rights of co-stockholders. This increasing danger and difficulty has often led to the institution of suits for the protection of stockholders. The powers of a court, of equity are not often vainly sought to redress a manifest injury where the corporate authorities have refused to proceed. This is no infraction of the general rule that corporations must act by properly constituted authority and organization, and by corporate methods and in corporate ways. The necessity of effort to procure such action has been settled by a series of well considered cases. The question was set at rest in this state in an exceedingly well considered and able opinion by the present chief justice of the supreme court. To the fullest extent that learned court indorsed the doctrine of the English cases, and expressed its approval of the leading case in the supreme court of the United States. Miller et al. v. Murray, 17 Colo. 408; Hawes v. Oakland, 104 U. S. 450; Foss v. Harbottle, 24 Eng. Chan. 461; MacDougal v. Gardiner, 1 L. R. Chan. D. 13; Memphis City v. Dean, 8 Wall. 65.
Tested by this rale, none of the suits brought by Beshoar can be maintained. His pleadings are totally wanting in all averments, either of request or of excuse, and, being bills on behalf of a stockholder to redress a corporate injury, they do not state a cause of action. We might be inclined to disregard this defect if the case as he made it contained the elements of an excuse for his failure. None was proven and none exists. The court very properly found that none of the other directors or officers of the Grey Creek Company were concerned in the contract which Chappell made with the C. C. & I. corporation, or had anything whatever to do with reference to those acts which Beshoar charges were a *333 fraud on the Grey Creek Company. It was found that Beshoar made no request of the Grey Creek officers or directors to institute a suit against Chappell to compel him either to account for the stock or the money which he had received from the sale of it. As Chappell was the onty person concerned in the diversion of the funds or in the appropriation of the stock, we cannot presume that the Grey Creek Company as a corporation, would have failed on request to institute the proper suit for the enforcement of the corporate rights. It was Beshoar’s duty to show that he had exerted all means within his power to obtain by corporate action the redress of his grievances. The court must be satisfied that all honest and reasonable efforts were resorted to to the accomplishment of that end. Failing in this, he will not be permitted to maintain his suit. There is nothing in the present case which brings the plaintiff within the rule, and there is no testimony in the record which permits us to assert for his benefit what, under other circumstances, might prove operative as an excuse.
The suit was,not honestly instituted by Beshoar for his own benefit, and he was without capacity to maintain it. The judgment as to him must be affirmed. We desire, however, to state that this affirmance shall not be operative to conclude the Grey Creek Company, or any stockholder of that corporation, from instituting and maintaining such suit as they may be advised concerning this matter, providing otherwise the legal right still remains with them.

Affirmed.