ELIZABETH D. CARVER et al.

*v.*

SOUTHERN IRON AND STEEL COMPANY.

[Decided October 31st, 1910.]

1. Under a statute requiring that stock shall be fully paid for either in property or cash, a domestic corporation may not issue debentures for sale at ninety-three cents on the dollar with the privilege to the holders to convert them into preferred stock at seventy cents on the dollar.

2. A domestic corporation seeking to justify its right to issue stock to its reorganization committee in payment of a debt due by it to the committee creating and controlling the corporation must, as against an objecting stockholder, show that it owes the debt to the committee.

3. Where a domestic corporation sought to issue stock to its reorganization committee for the alleged purpose of paying a debt due by it to the committee, a stockholder objecting on the ground that there was no debt due from the corporation need not make the committee a party defendant.

4. Where a plan for the reorganization of a bankrupt corporation called for an agreement between the bond and security holders of the corporation, its general creditors and stockholders and a reorganization committee for the taking over by the committee of the assets of the corporation and the transfer of them to a new corporation and the reorganization committee with the stocks and bonds received from the new corporation satisfied the bond and security holders and creditors, the corporation could not issue additional stock to the committee on the theory that it was indebted to the committee for money advanced by the committee without showing the existence of a loan by the committee to the corporation.

5. In a suit by a stockholder to restrain the corporation from issuing stock and selling the same at less than par, evidence *held* not to justify a finding that the reorganization committee creating and controlling the corporation was a creditor of the corporation, so that it was entitled to the additional stock.

6. A holder of a small amount of stock in a corporation may sue to enjoin the issuance of preferred stock for ·sale at less than par, though the proposed issuance cannot injure his interests, since the proposed action is in violation of law.

7. Where, pending a suit by a stockholder to enjoin the corporation from issuing preferred stock for sale at less than par, other stockholders appeared, without objection, as parties complainant, the court could grant the relief, though the original complainant was not a *bona fide* complainant.

8. Where a corporation sought to issue debenture bonds to be sold at ninety-three cents on the dollar with the privilege of the holders of converting them into preferred stock at seventy cents on the dollar, and the corporation, to accomplish the purpose, was required to issue new preferred stock, and there was no provision that it should receive more than seventy cents on the dollar for it, the plan of the corporation could not be justified on the ground that in the aggregate the money received under the scheme would exceed the par value of the new stock.

---

Heard on bill and proofs by complainants and proofs by the defendant.

*Mr. William D. Edwards* and *Mr. Maximilian T. Rosenberg* (with whom was *Mr. Pette,* of the New York bar), for the complainants.

*Mr. Chauncey G. Parker* (with whom were *Messrs. Hornblower & Miller,* of the New York bar), for the defendant.

GARRISON, V. C.

This is an application upon a bill and affidavits for an injunction to prevent the defendant corporation from increasing its authorized capital stock and providing for a new issue of preferred capital stock, and selling or disposing of such new stock at less than par. From the bill and the proofs accompanying the same it appeared that the complainant was a stockholder of the defendant corporation; that the defendant corporation was seeking authority from the stockholders to carry out a contemplated

scheme according to which it should issue $1,200,000 of debenture bonds to be sold at ninety-three, with a provision that they might be converted, at the option of the holder, into preferred stock of the defendant corporation at seventy cents on the dollar of the par of the stock.

The purpose, as stated in the call for the meeting and the accompanying papers, was to sell the $1,200,000 of debentures at ninety-three, and to deposit, with a trust company, preferred stock in something over the amount of $1,700,000 par value so as to insure the holders of the debentures that they might convert the same, by applying to this trustee, into preferred stock at seventy cents on the dollar of its par.

Since the company stated that it had ten thousand shares, or $1,000,000 par value of such preferred stock "available," it sought authority from the stockholders to increase the authorized capital of the company so that the necessary seven hundred and odd thousand dollars worth of preferred stock needed for the scheme aforesaid could be obtained.

There can be no question, and it requires no citation of authority, that a New Jersey corporation cannot lawfully issue debentures to be sold at ninety-three, the holders of which shall have the privilege of obtaining from the company its preferred stock at seventy per cent. of its par, if the scheme contemplates the issuing of stock of the company at less than par. Such a claim would be directly in the face of the statute which requires that stock shall be fully paid for, either in property or in cash. The complainant, therefore, upon the showing made by the bill and affidavits, was clearly entitled to a preliminary injunction restraining the corporation from practically issuing its stock at seventy cents on the dollar.

The defendant, by answering affidavits and proofs, puts a different phase upon the matter. It insists that it is not seeking to increase its authorized capital so as to provide stock to be sold at seventy cents on the dollar, and sets forth an extended explanation. Generally stated, the defendant's position is this: The Southern Iron and Steel Company is a New Jersey corporation which was caused to be formed by the reorganization committee of the Southern Steel Company. This latter company became

bankrupt and a reorganization committee was formed to take care of the various lien security and stockholders, and a plan and agreement of reorganization was proposed and entered into. This complainant became a party to such agreement and plan. Under the plan, property which belonged to the Southern Steel Company was purchased at the bankrupt sale on behalf of the committee, and was transferred by the committee, or its agent, to the new company which it caused to be formed, namely, this defendant corporation; that, in pursuance of the plan and in consideration of the transfer, the defendant corporation issued to the committee its bonds, preferred and common stocks, in the amounts provided for in the plan; that the committee has expended moneys for and on behalf of the new company in excess of those which the plan and agreement provided that it should expend, and that the amount of such expenditures, in excess of the amounts provided in the agreement, equals $755,000; that out of the stock issued by the defendant corporation to the committee under the reorganization agreement there are ten thousand shares of preferred stock which the committee has available for the purposes of its trust; that the new company (the defendant corporation) is in need of additional moneys to properly carry on its business; that the contemplated scheme is this: The defendant corporation is to authorize the issue of $1,200,000 debentures, to be sold at ninety-three cents on the dollar; it is to increase its authorized capital stock and create a new issue of preferred stock, and issue to the committee, in payment of the debt due by it to the committee, something in excess of seven thousand shares, or $700,000 worth of such new stock. The committee has already placed the ten thousand shares of preferred stock which it had in its possession and is to place the additional seven thousand shares of such stock with a trust company, to insure to the holders of the debentures the ability to receive preferred stock in exchange for their debentures at seventy per cent. of the par value of such preferred stock. The committee is to cancel its indebtedness against the new company, the defendant corporation.

The argument of the defendant upon this assumed state of facts is that, as to the ten thousand shares which are issued and

outstanding, they belonged to the committee for the purposes of their trust, and, in accordance with the terms of the latter, they may be pledged, or sold, or otherwise dealt with by the committee at such price and in such manner as to it seems fit, and that the committee therefore has perfect power, if it sees fit, to use such stock as an aid to selling the debentures; that the new stock is to be issued to the committee in payment of a debt due by the new company to the committee; that there is nothing to prevent a New Jersey corporation, with the assent of the majority of its stockholders, from increasing its authorized capital stock for a legitimate purpose; and that the payment of a debt by the issuance of stock at par therefor is legitimate and cannot be attacked by a stockholder.

The defendant vigorously insists that since the reorganization committee is not a party defendant, the complainant may not question its acts, and must make out a case wholly without reference to its conduct.

I do not think that this objection should have the result which the defendant contends for. As previously pointed out herein, the complainant's case on her bill would result in her obtaining the relief sought.

The call for the meeting and the accompanying papers, if taken to mean just what they say, disclosed a scheme in direct opposition to our Corporation act, and one that the court would not permit to be carried out in the face of objection by a stockholder. The defendant perceived this, and by its affidavits and other proofs and by its argument sought to show that it was not intending to issue the stock and dispose of it at less than par.

It is the defendant which seeks to justify its action, who brings in the reorganization committee, the agreement, and the facts with respect thereto. Unless, therefore, the defendant succeeds in justifying its conduct by reason of the relationship between the company and the reorganization committee, the complainant must prevail.

The defendant contends, and it may be true, that the reorganization committee is a separate entity from the defendant corporation, and that in an action against one the rights of the other

may not be adjudicated. I shall not stop to cite or analyze the cases which the defendant refers to under this head.

But, whatever the law may be in this respect, it does not alter the principle to be applied to the case at bar. If, instead of a reorganization committee, this defendant, when its right to issue this new stock was challenged, set forth in its reply that it was about to issue the said new stock to X in payment of a debt due by the defendant corporation to X, it would be requisite for the defendant, to make its justification effective, to maintain and support its allegation that it owed the debt to X. If this is so, upon the assumption that X is a third party, dealing at arms' length with the company, *a fortiori* would it be so where X is a reorganization committee which created the defendant corporation and controls it, and has, very clearly, trust relations with respect to it?

It will be found from an inspection of the plan and agreement of reorganization attached to the defendant's papers that the general provisions covered these points. The bondholders, security holders, general creditors and stockholders of the old company were to enter into an agreement which made the committee their trustees to carry out the plan. The plan provided for taking over the assets of the old company and transferring them to a new company to be formed and controlled for a certain period of time by the committee. The bonds and stock of the new company were to be issued to the committee and were to be utilized by it in paying off the old bondholders, security holders, general creditors and stockholders by substituting the new securities for the old upon certain stated terms, and such new securities not needed for that purpose were to be used to raise funds for certain cash requirements, among them a working capital of $1,-750,000 for the new company.

Part of the consideration which underlies the issue of the new securities was the properties and funds to be acquired by the new company under the plan of reorganization (see page 7 of plan); and any cash or securities not needed by the committee for the purposes of the plan were to be turned over by it to the new company, such securities, when turned over, to be treated as treasury securities (page 7 of agreement).

The plan was declared operative and was put into effect, the committee causing the new company to be incorporated, and to issue the securities in pursuance of the plan; and has, it asserts, done all the things required to be done by it; and has, in addition, loaned the new company $755,000 in cash. It also asserts that it has ten thousand shares of the preferred stock not needed by it for the purposes of reorganization and available by it for any of the purposes of the new company, although it might not be proper to say that this was not part of the scheme of reorganization.

If the moneys which the reorganization committee expended upon behalf of the new company were raised by it upon the securities issued to it under the plan of reorganization, it seems perfectly clear to me that it cannot now call for any new or additional issue of stock in repayment of such moneys. It cannot properly call itself a creditor of the new company and be held to be such for the purpose of having fresh additional stock issued to it in payment for moneys thus expended.

The very purpose of the plan as disclosed by the defendant, was to have the new company issue all of its securities to the committee and give the committee almost unlimited power to dispose of those securities, for the purpose of clearing up the old situation and financing the new company. If, in doing so, the committee raised money upon the securities in its hands and spent such money on behalf of the new company, it did so in pursuance of the plan and agreement of reorganization, and is not, in my view, entitled to call upon the new company for any additional issue of stock in payment for what it was already under obligation to do.

If the committee has not done all of the things that it was required to do by the agreement and plan, so far as the new company is concerned, I do not think it would be proper for it, as against other stockholders, to cause its creature (the new company) to issue additional securities to it over and above those which the plan provided that it should cause it to issue. It surely would not be right to hold that, until it has done the things which it has already agreed to do, it should receive more stock.

The only event in which I can see that it is proper to permit the issue of the seven thousand shares of new preferred stock to the committee, would be if it should appear that the committee had fully done the things which it was required to do so far as the new company is concerned, and, in addition to doing all of such, had, out of its own individual resources, by the credit of its members, or out of the pockets of its members, raised the $755,-000 and loaned it to the new company. If this should be made to appear, I do not, as at present advised, see any objection in law or equity to the issuance of stock by the new company in payment of this loan.

And the fact that the persons to whom the stock is to be issued, namely, the committee, propose practically to give the stock back to the company, would then be no concern of anyone excepting themselves, and certainly could not injure the stockholders.

It is very difficult, however, to believe that any such state of facts exists. It is very difficult to believe that the seven gentlemen constituting this committee propose to lose, out of their own resources, a sum in excess of seven hundred thousand dollars. If it is not a *bona fide* loss to them, it is not a *bona fide* issue of stock. They must stand or fall upon the effectiveness of the justification of the issuance of this stock which they insist is proper.

If they have not advanced this money out of their own pockets, and do not propose losing it, then the scheme is a bald one to obtain stock of this company at seventy cents on the dollar; and that is forbidden by law.

It should be observed that the result which I have reached is not by considering that the reorganization committee is a party defendant to this suit, or that the complainant in this suit can properly interfere with or control its action. The result is reached by applying well-settled principles to the facts which the defendant itself stands upon as the existing conditions. It is undisputed that the reorganization committee is in control of the defendant corporation. It is undisputed that all of the securities of the defendant corporation were issued to the reorganization committee for certain purposes.

It is too plain to require argument that no new securities should be issued to such committee for any of the purposes dis-

closed in the plan and which it was already under duty to carry out. The company, its creature and which it controls, justifies the issuance of this new stock to the committee by asserting that, over and above everything that the committee was required to do and has already been paid for doing by the issuance to it of all of the securities of the defendant corporation, it has advanced $755,000 in cash to the company which it is willing to lose if the scheme herein sought to be carried out is not interfered with —that is to say, that for this money which the committee, outside of the agreement and not by reason of it, advanced to the company, the committee, or the members who are the creditors, will accept stock of the company at par, and then immediately virtually give this stock back to the company—that is, put it up with a trust company to go to the persons who buy the debentures so that they can get the stock at seventy cents on the dollar. The requisite thing, therefore, in my view, is to search the proofs presented by the defendant with sufficient care to ascertain whether it appears that the reorganization committee advanced this money outside of all of the requirements of its agreement, and just as though it had been advanced by a stranger. If such a state of facts does not appear from the defendant's proofs, then I think the injunction should go, otherwise it should not.

[At this point the defendant introduced additional proofs and the testimony of several witnesses was taken. The court then took up the consideration of the matter in view of the previous proofs and those thus offered.] A consideration of the proofs results in the following findings:

The reorganization committee, with the stocks and bonds that it received from the defendant corporation, satisfied all the *cestui que trustent* of the reorganization committee—that is, the old bondholders, security holders, creditors, and what not, who had signed their plan, and after doing so, had certain securities in their hands; and from these, and the various other sources from which they were to get cash, they received the following sums of money: They sold $65,000 of bonds at seventy and interest, and realized $45,802.05; they sold thirty-seven thousand five hundred shares of preferred stock and sixty-seven thousand five hundred shares of common stock, and realized $2,600,000;

they received interest on deposits of money amounting to $4,-479.44; they received a refund on account of mechanics' lien amounting to $186; they received the proceeds of the sale of nine hundred and thirty-five of the bonds of the defendant corporation, amounting to $677,875. The aggregate of these receipts is $3,328,342.49. The committee expended money as follows: For clearing the properties of mortgages, accrued interest, liens, taxes, &c., $1,559,727.12; they were required to pay the trustees in bankruptcy $42,004.30; the various expenses of the committee, the details of which are set forth in Exhibit "B," were paid, amounting to $254,106.23; they paid to the new company for the stock issued by the new company at its incorporation $20,000; they paid to the new company in cash the amount received from the sale of the nine hundred and thirty-five bonds referred to, amounting to $677,875; they paid in cash, at various times to the new company, or to creditors of the new company, the sum of $773,153.09. The total of the amounts paid, as above enumerated, is $3,326,865.74.

It is the contention of the committee that, with respect to $773,153.09 of moneys transferred by it to or on behalf of the defendant corporation, they are entitled to have a credit in their favor against the defendant corporation, and to use this credit as the consideration of the issuance to them of that amount of the newly-created preferred stock of the defendant corporation.

The defendant now seeks to support this contention by a different theory from that initially advanced.

It will be recalled that in the earlier part of this opinion the theory then advanced is set forth. That theory was that the committee, outside of moneys received from the securities of the defendant company, had obtained money and loaned it to the defendant corporation, and therefore had the right to receive stock of the defendant corporation in payment of such loan. No evidence was adduced to support this theory; and the present theory which has been substituted for it, is that the plan and agreement contemplated the expenditure of $1,000,000 for improvements and repairs, and that it can be shown now by the books of the company that the sum of $1,784,736.17 has actually

been spent by the defendant corporation for repairs and improvements; wherefore, it is argued, as respects all over the $1,000,-000 estimated in the plan for improvements and repairs, it is proper to treat the said excess as something outside of the plan, which the committee was not under obligation to furnish, and which, since the company has spent the money for that purpose, may be treated as a loan by the committee to the corporation of that much fresh money for this purpose outside of the agreement.

I cannot agree with this argument. It seems to me to be perfectly clear that this committee, having in its hands under the agreement the stocks and bonds of the defendant corporation, was required to do with them what the plan and agreement pointed out should be done; that they had the widest kind of discretion, and might have done all kinds of things; but, of course, we are only concerned with what they did do. What they did, so far as the company is concerned, was to take the stocks and bonds and realize money thereupon and turn that money over to the new company, or spend it for things beneficial to the new company. And the fact that the new company, either with the concurrence of the committee or upon its own volition, invested such money as it received from the committee in one thing or in another, or spent it in one way or another, or kept it on hand, is entirely immaterial in my view.

The defendant strenuously insists that it has the right now to say that it can agree with the committee that the money which the committee turned over to it shall now be considered as a loan, although I do not see how any serious argument can be made that any such now-considered loan can be used as the basis for issuance of new stock. There is not a scintilla of proof that has been called to my attention that when the money was transferred from the committee to the company anybody viewed it as a loan, or treated it as a loan, or treated it in any other way than as money turned over by the committee to the company in pursuance of the obligation of the committee to turn over to the company all excess money that it had over and above that which was required for other purposes of the plan and agreement of reorganization.

It is true that some of the defendant's witnesses refer in their testimony to this money as a loan, and talk about it as a loan, but it will be observed in what I have said above that I refer to the transactions at the only material time, which is when they took place, and there is no proof that at the time that those transactions took place anybody looked upon this money transferred by the committee to the company as a loan; perhaps it would be better to say "moneys," because different sums were advanced at different times.

I have not overlooked the fact that in some of the bookkeeping entries these items are referred to as advances, which, of course, they were; but it is entirely too clear to require more than statement that if the transaction at the time it took place was of any such character as the defendant now insists, the evidence upon the books of each of the parties involved, namely, the new company and the reorganization committee, would contain the fullest and completest evidence thereof.

It was perfectly natural, when the money was paid over from time to time, that it should be carried on the books as an advance because there was no particular heading of account under which it should go until some final statement was made. If, however, it had been what they now attempt to say that it was, namely, a distinct loan of money by the committee to the new company, it would have appeared in all of the carefully kept books of these two parties in an unmistakable fashion.

I am rather inclined to think that even if they had attempted to treat it as a loan initially, it so palpably was not such that their attempt would be futile.

The so-called "loan" was simply money raised upon the securities of the defendant corporation, by the sale of such securities by the reorganization committee. When the reorganization committee turned such money over to the company, as it did from time to time, I cannot see, under all the circumstances in this case, and the trust evidenced by the reorganization agreement, how in any legal sense such money could be considered as a loan.

All the money that the committee had on hand as the result of the sale of the securities that it obtained in the reorganization,

which was not properly devoted to other purposes, belonged to the new company. The committee transferred it to the new company, and, in my view, that ended the obligation of the committee and the rights of the new company, the defendant, with respect to such money. To now permit the company, as against the objection of a stockholder of the defendant corporation, to issue new stock based upon its own money paid into it by the committee, would be practically to permit two issuances of stock for the one consideration. The stock which was issued originally by the company to the reorganization committee, it is argued (and for the purposes of this suit assumed), had a good consideration. The committee, taking that stock and disposing of it, turned the proceeds over to the company, as it was obliged to do; and such money, so turned over, cannot, in any proper sense of the word, be said to be consideration for the issuance of new stock.

With respect to the suggestion of the defendant that the complainant is the holder of a small amount of stock, and that the proposed issuance of new stock at less than par cannot injure her interests, the complete answer, in my view, is contained in the language of the present chancellor in the case of *Easton National Bank* v. *American Brick Co.* (*Court of Errors and Appeals, 1905*), *70 N. J. Eq.* (*4 Robb.*) *740.* He there says: "The express prohibition of section 54, and the whole spirit and policy of the act, are so clearly opposed to any arrangement by which corporate stock shall be issued without the receipt by the company of an equivalent in value to its par, that any agreement to this effect must be deemed void as contrary to the policy of the law."

It may well be that in cases where the corporation has dealt with its own directors, or with a corporation that has mutual directors, and there is a discretion in the court to affirm or disaffirm the contract when applied to by a stockholder, the court will weigh the benefits and injuries; but this cannot be applicable to a case where the thing sought to be done is contrary to the statute, is prohibited by law, and only needs the attention of the court to be called to it to cause the latter to restrain it.

The next point which will require consideration is this: The facts, as proven before me, I find it proper to summarize as follows: This suit is brought in the name of Elizabeth D. Carver.

It is brought by counsel who have never seen Elizabeth D. Carver; who do not know her; who received no instructions concerning the suit from her, and who brought it because George H. Schuler desired it brought. It is unquestionably true, to my mind, that Mr. Schuler, who has either real or fancied grievances against the reorganization committee, and who has brought numerous suits, or caused them to be brought, against the same and against the defendant corporation, wishing further to pursue whatever legal means he could of interfering with the reorganization committee and the new company, sought some one to bring this suit for the purpose of obtaining an injunction to prevent this stock issue. Not himself being a stockholder of record of the defendant corporation, he obtains Mrs. Carver's permission to use her name in the prosecution of this suit, and takes it to his counsel who have appeared for him in numerous other similar suits against the reorganization committee, and instructs them, and agrees with Mrs. Carver that she shall be held harmless from any expense.

The question which is raised on this state of facts is whether a court of equity should entertain a bill for injunction which is filed by one who has only a nominal interest in the controversy—that is to say, one who did not of her own volition make any move, who was sought out by another who was not similarly situated, whose suit is financed by such other, and is directed and controlled by such other?

If the subject-matter were not one which, in the line of citation, beginning with the *Donald Case* (*Court of Errors and Appeals, 1900*), *62 N. J. Eq.* (*17 Dick.*) *729;* and coming down through the *Volney Case* (*Court of Errors and Appeals, 1904*), *68 N. J. Eq.* (*2 Robb.*) *605,* to the *Easton National Bank Case* (*Court of Errors and Appeals, 1905*), *70 N. J. Eq.* (*4 Robb.*) *732,* had been held by the court of errors and appeals of this state to concern a matter not only illegal and against public policy, but intimated to be almost immoral, I should not have much doubt about the attitude which the court would take; but if this question is one which concerns public policy, and if it is one which is so abhorrent to our law that the court will put the principle in operation whenever it is appealed to, then there

must be a very careful decision as to the rights of this complainant who here seeks to put in motion this court's power in this respect.

I can very well understand that, in a case where the rights of the individual solely were concerned, a complainant circumstanced as this one is, might not have her rights protected. Authority would seem, however, to be favorable to her right to maintain her suit, even upon the supposition just stated. *Hodge* v. *United States Steel Corporation* (*Court of Errors and Appeals, 1902*), *64 N. J. Eq. (19 Dick.) 111.* But where the public policy of the state is concerned—where the thing that is sought to be done by the defendant is voidable, *ultra vires,* illegal, and, in the above cases, stated to be practically immoral, a very different rule should be applied. I am, however, relieved of the necessity of passing upon this, because at this point other persons were admitted as parties complainant who held stock in the defendant company, and whose presence in the suit is not attacked, and to whom the relief must be accorded, if it is proper that equitable relief should be accorded to a properly circumstanced complainant in this suit.

There is one matter alluded to in the final brief furnished me by the defendant which was not alluded to in any of the oral arguments, and which I shall briefly refer to; it is argued in the brief that since more money is intended to be raised on the debentures than would pay at par for the contemplated increase of preferred stock, the company should be permitted to go ahead and issue and put out the preferred stock under the plan.

The fallacy of the argument is that it ignores the fact that each purchaser of a debenture is entitled to take the debenture which he purchased at ninety-three cents on the dollar to the trustee and obtain preferred stock of the company at seventy cents on the dollar; and that to enable the company to accomplish this, it is necessary that it issue and put out the new preferred stock, for which new preferred stock there is no provision anywhere that it shall receive more than seventy cents on the dollar. While it is true that in the aggregate the money to be received under the scheme will exceed the par value of the newly-created stock, it is not true that for such newly-created stock it

is contemplated to receive any more than seventy cents on the dollar.

I will advise that a preliminary injunction do issue to prevent the defendant corporation from issuing to the reorganization committee its preferred stock at less than the par value thereof, to be paid in cash, and will restrain the corporation from holding a meeting under its call, at which it shall approve a plan of issuing such stock to the said committee as in the call provided. Counsel may be heard upon the form of the order.