SOUTHWESTERN PORTLAND CEMENT CO. et al. v. LATTA & HAPPER et al. (No. 659.)

(Court of Civil Appeals of Texas. El Paso. March 15, 1917. On Rehearing, April 12, 1917.)

1. CORPORATIONS ⊚═189(1) — STOCKHOLDERS' SUIT—PAYMENT OF EXPENSES BY COMPETITOR CORPORATION.

Minority stockholders in a corporation, objecting to establishment of an additional plant in another state, and desiring to sue the corporation in good faith to protect their own interests and those of other stockholders, had the right to avail themselves of the selfish interest of a competitor corporation to procure funds to prosecute the litigation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 706.]

2. PLEADING ⊚═193(5)—DEMURRER.

If a petition to which general demurrer was filed stated a good cause of action in any particular, the demurrer was properly overruled.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. §§ 433, 441, 442.]

3. CORPORATIONS ⊚═665(3) — STOCKHOLDERS' SUIT—PETITION—JURISDICTION.

A West Virginia corporation, expressly authorized by its charter powers to do business in Texas, and which had obtained the necessary permit and was actually doing business in Texas, having officers and agents stationed here, was subject to the jurisdiction of the courts of the state, and the court could entertain a minority stockholder's suit on behalf of the corporation to recover unlawful payments of salary made to officers, etc.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2571, 2600.]

4. CORPORATIONS ⊚═189(9) — STOCKHOLDERS' SUIT—PARTIES DEFENDANT.

In a suit against a corporation by a minority stockholder to enjoin an act in fraud of his rights, it is not necessary to join as parties defendant the majority stockholders at whose instance the proposed action is about to be taken.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 717.]

5. LIMITATION OF ACTIONS ⊚═180(2)—DEMURRER.

The fact that a petition discloses on its face that it is barred by limitation does not subject it to general demurrer.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. § 671.]

6. APPEAL AND ERROR ⊚═843(4)—REVIEW—ACADEMIC QUESTION.

In a stockholder's suit, where the decree expressly denied plaintiffs any right to relief by way of enjoining the corporation from acquiring property in California, the proposition that so much of the petition as sought such injunction was fatally 'defective presented an academic question.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3336.]

7. PLEADING ⊚═34(3)—CONSTRUCTION—GENERAL DEMURRER—PRESUMPTION.

As against a general demurrer, every reasonable intendment is indulged in favor of the pleading attacked, so that, in a suit by minority stockholders against the corporation, it will be presumed that plaintiffs were stockholders at the time some of the acts complained of were committed; the petition being met by general demurrer.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. § 69.]

8. CORPORATIONS ⊚═99(2)—ISSUANCE OF STOCK—OVERVALUATION—STATUTE.

Under Code W. Va. 1913, c. 53, § 24 (sec. 2857), providing that any subscriber to the capital stock of a mining or manufacturing corporation may pay for it by the conveyance of property proper. and necessary for the use of the corporation upon such terms as may be mutually agreed upon, and that, in the absence of actual fraud, the valuation of the property shall be conclusive, etc., to invalidate an issue of stock by a West Virginia manufacturing company for property taken ·at an overvaluation, it must be shown, not only that there was an overvaluation, but also that it ' was intentional and fraudulent, and such fraud will not be implied from a mere finding that the property was in fact worth less than the par value of .the stock; Rev. St. Tex. 1911, arts. 1126, 1127, 1145, requiring certain proof to be made to the Secretary of State of the cash value of property which it is proposed to give in payment of stock, having no application, the statute of West Virginia governing.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 445.]

9. CORPORATIONS ⊚═99(2) — ISSUANCE OF STOCK FOR PROPERTY—OVERVALUATION.

A corporation may lawfully issue its stock in payment for property conveyed to it, and when the corporation's representatives fairly and honestly issue stock in payment for property, and the par value of the stock is equal to the valuation placed by them on the property, the transaction· cannot be set aside because of mere overvaluation of the property.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 445.]

10. CORPORATIONS ⊚═105—FOREIGN CORPORATIONS—ISSUANCE OF STOCK.

If the issuance by a West Virginia manufacturing company to its president of shares of stock in payment for property in California was a violation of Rev. St. Tex. 1911, art. 1146, forbidding the issuance by a foreign corporation doing business in Texas of stock in payment for property not reasonably worth the sum at which it is taken, the fact merely au-

---

thorizes forfeiture of the company's permit to do business in Texas.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 456–460.]

**11. CORPORATIONS ☞308(1)—SALARY OF OFFICERS.**

Where officers of a corporation had rendered services ever since the organization of the company, and no salary had ever been paid them, and it was evident that the parties did not intend or understand they were to be paid for their services, payment of back salaries to them by the corporation for a year was without consideration, and judgment for the amounts was properly rendered against the officers in suit by minority stockholders, since the right of the officers to salary depends on the existence of a contract express or implied.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1334, 1335, 1348½.]

**12. CORPORATIONS ☞373, 434 — CHARTER POWERS.**

The articles of incorporation of a West Virginia manufacturing company read that the principal place of the business of the company should be located in El Paso, Tex., and its general works located there, and such paragraph of the charter was later amended to provide that the company might own and maintain branch works at or near a named town or city in California. Another paragraph of the charter provided in the broadest terms that the corporation was formed to locate, hold, operate, and dispose of quarries, mines, and clay lands, tramways, railroads, and rights of way, to carry on the business of mining, quarrying, tunneling, milling, railroading, etc., buying, selling, and handling clay, etc., cement and artificial stone, etc. Code W. Va. 1913, c. 54, § 23 (sec. 2916), relates to the principal office of a corporation, stockholders' meetings, and notice. Chapter 52, § 1 (sec. 2811), provides that every corporation may make ordinances and by-laws and regulations for the action of its government, board, officers, and agents. Chapter 52, § 2 (sec. 2812), provides that the powers mentioned in the preceding section, or otherwise granted, shall be limited to the purpose for which the company was incorporated. Chapter 54, § 6 (sec. 2899), requires the charter to state the location of the company's principal place of business and of its chief works, etc. Chapter 54, § 21 (sec. 2914), provides that any corporation may by resolution change the place of its principal office or chief works. And chapter 32, § 124 (sec. 1257), divides corporations into two classes, domestic and foreign. *Held,* that under its articles of incorporation and the laws of the state of West Virginia the company was authorized to own property and carry out the purposes for which it was organized at any other place or places than El Paso, Tex., and the amendment to its charter authorized it to acquire and operate property in the named city in California.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1524, 1763–1771.]

**13. CORPORATIONS ☞110 — IMPROPER ISSUANCE OF STOCK—REMEDY.**

If corporate stock was about to be issued for an unauthorized purpose, the proper remedy for minority stockholders was to enjoin the issuance, and it would not be proper for the court to undertake to cancel the authorized capital stock of the corporation or any part simply because it was proposing to issue the same for an unauthorized purpose.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 461.]

**14. LIMITATION OF ACTIONS ☞39(7)—STATUTE APPLICABLE—SUIT BY MINORITY STOCKHOLDERS—RIGHT TO QUESTION ISSUANCE OF STOCK FOR PROPERTY.**

Where a corporation issued stock in payment for property and there was no attempt to conceal the terms of the transaction whereby the stock was issued, the right of minority stockholders to any relief was barred by the four years' statute of limitations.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. § 198.]

**15. CORPORATIONS ☞152 — DECLARATION OF DIVIDENDS BY DIRECTORS—INTERFERENCE BY COURT.**

Where the board of directors of a corporation did not act in bad faith in refusing to disburse a surplus in dividends, the court would not interfere and require them to declare dividends.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 564–567.]

Harper, C. J., dissenting.

On Rehearing.

**16. CORPORATIONS ☞317(2)—DUTIES OF PRESIDENT—ACQUISITION OF PROPERTY FOR SALE TO COMPANY.**

The president of a corporation occupies a fiduciary capacity, and where he personally acquires property with the view to disposing of it to the company, and does so, he becomes liable to the company for any profit he may make, unless he makes a full disclosure and the entire contract is open, fair, and honest.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1403.]

**17. TRIAL ☞388(2)—SUBMISSION OF SPECIAL ISSUES—ADDITIONAL FINDINGS BY COURT.**

In a case submitted upon special issues, the trial court upon request may file findings of fact which definitely show what facts were found by it in addition to the jury's findings, and upon which the judgment is based, and, though the court cannot be required to make up and file such findings, due consideration can be given to them when made in response to a request.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 909.]

**18. APPEAL AND ERROR ☞930(3)—REVIEW—FINDING—STATUTE.**

Under Rev. St. 1911, art. 1985, providing that on appeal issues of fact not submitted to the jury and not requested to be so submitted are to be deemed as found by the court in such manner as to support the judgment, if there be evidence to sustain such finding, every issue in a case found by the trial court must be deemed to have been found so as to support the judgment, where plaintiff appellants do not point out or complain of a single finding as having no evidence to support it.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3759.]

Appeal from District Court, El Paso County; P. R. Price, Judge.

Suit by W. D. Latta and J. A. Happer, composing the firm of Latta & Happer, and others, against the Southwestern Portland Cement Company and others. From a judgment in part for plaintiffs, both parties appeal. Reformed and affirmed.

Burges & Burges, of El Paso, and McNamee & McNamee, of Los Angeles, Cal., for Southwestern Portland Cement Co. and others. Davis & Goggin and T. A. Falvey, all of El Paso, for Latta & Happer and others.

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Statement of Case.

HIGGINS, J. On July 6, 1915, W. D. Latta and J. A. Happer, composing the firm of Latta & Happer, E. E. Neff, trustee, et al., suing for themselves and in behalf of all stockholders of the Southwestern Portland Cement Company who were similarly situated, filed this suit against the Southwestern Portland Cement Company and against the directors and the secretary of said company to enjoin them from constructing and operating a cement plant near Victorville, in the state of California, and for other relief. It was alleged that said company was a corporation, incorporated under the laws of West Virginia, and, under its charter, had no power to construct and operate such plant; that the board of directors had unlawfully paid to defendant Leonardt, its president, and to defendant Martinez, its vice president and secretary, $6,000 and $1,200, respectively, in back salaries, for which they asked judgment in behalf of the corporation; that defendants Leonardt and Martinez and Courchesne had acquired the stock of the corporation at less than par; and that defendants had otherwise diverted and appropriated the funds and assets of the corporation, to its damage. Plaintiffs prayed an injunction to restrain the issuance and sale of stock for the purpose of erecting the California plant, and asked for a full accounting of receipts and disbursements of the funds of the corporation, and, upon such accounting, prayed the court to give plaintiff judgment in behalf of the corporation against any of the defendants who had wrongfully acquired any of the property or funds of the corporation, and that all surplus moneys on hand be declared dividends by the board of directors. Plaintiffs alleged provisions of the laws of West Virginia and of the charter of defendant corporation claiming that the same showed that the establishment of a cement plant in California was ultra vires. They also pleaded that in violation of the law defendants were about to give to defendant Leonardt, the president of the corporation, $75,000 worth of the capital stock of the corporation for the cement site at Victorville, which was worth not more than $18,000, and that they were about to unlawfully purchase and acquire the capital stock and properties of the Mojave Northern Railway Company and make the defendant corporation a common carrier.

The pleadings in the case are very voluminous, and it is believed the foregoing statement is sufficient to indicate the issues raised by the plaintiffs' suit. It is unnecessary to detail the pleadings of the defendants.

The case was tried before a jury and submitted upon special issues. The questions asked and the answers of the jury thereto are as follows:

"No. 1. Do you find from the preponderance of the evidence that plaintiffs instituted this suit for the sole benefit of John G. Treanor, or for the sole benefit of said Treanor and other persons or corporations? Answer: No.

"No. 2. Do you find from the evidence that at the time the trustees Martinez and Leonardt conveyed the El Paso property to the Southwestern Portland Cement Company that the value of the same for the purpose of the manufacture of cement was $300,000, or in excess of that sum? Answer: No.

"No. 3. What was the actual value of said El Paso property at the time of its conveyance by said trustees to the Southwestern Portland Cement Company? Answer: $175,000.

"No. 4. Do you find from a preponderance of the evidence, under, all the facts and circumstances in evidence, that the value of the property at or near Victorville, Cal., conveyed by Carl Leonardt to the Southwestern Portland Cement Company, was either of the value of $75,000, or of a value in excess of that sum? Answer: No.

"No. 5. What sum would represent the actual value of the property at or near Victorville, Cal., conveyed by the said Carl Leonardt to the Southwestern Portland Cement Company at the time of its said conveyance? Answer: $35,000.

"Plaintiffs' question No. 4: Do you find that the property turned over by the defendant Leonardt to the corporation for the purpose of establishing therewith a cement factory at Victorville, Cal., was at the time of such transfer to the company in value less than the value of the stock of the Southwestern Portland Cement Company that defendant Leonardt was to and did receive for said property? Answer: Yes."

"Plaintiffs' question No. 15: Do you find that the board of directors gave to defendant Leonardt back salary in the sum of $6,000 and to defendant Martinez back salary in the sum of $1,200? Answer: Yes."

The court rendered the following judgment in the cause:

"First. That the plaintiffs W. D. Latta, J. A. Happer, E. E. Neff, and Dr. Ida Bishop, take nothing by reason of their suit against the defendants J. G. McNary, T. A. Riordan, W. E. Keller, C. Boettcher, Robert Krakauer, F. H. Powell, A. Courchesne, C. C. Merrill, C. A. Fellows, and O. J. Binford, and that said defendants last above named go hence without day.

"Second. That the plaintiffs W. D. Latta, J. A. Happer, E. E. Neff, and Dr. Ida Bishop, take nothing by their suit, in so far as they seek to enjoin or restrain the defendants Southwestern Portland Cement Company, Carl Leonardt, Robert Krakauer, A. Courchesne, W. E. Keller, Felix Martinez, J. G. McNary, C. Boettcher, C. C. Merrill, T. A. Riordan, F. H. Powell, C. A. Fellows, and O. J. Binford, officers and directors of the said Southwestern Portland Cement Company, from acquiring property and directing, building, and maintaining and operating a cement manufacturing plant and works and properties incident thereto, at or near Victorville, in the state of California, or from expending the moneys of the said defendant company for said purposes or any of them.

"Third. It is further ordered, adjudged, and decreed by the court that the plaintiffs W. D. Latta, J. A. Happer, E. E. Neff, and Dr. Ida Bishop, either personally, in their own behalf, or in the interest of the said defendant Southwestern Portland Cement Company, or any of the stockholders thereof, take nothing by reason of their suit. as against the defendants Carl Leonardt, Felix Martinez, A. Courchesne, for the recovery of stock issued to them or any of them, in payment for lands purchased in the name of the defendants Southwestern Portland Cement Company, in El Paso county, Tex., for the erection of the manufacturing plant of said defendant company in El Paso county, Tex., or otherwise issued to them for any consideration, or for any purpose whatever, except as hereafter provided.

"Fourth. It is further ordered, adjudged, and decreed by the court that the plaintiffs W. D. Latta, J. A. Happer, E. E. Neff, and Dr. Ida Bishop, and for the use and benefit of the defendant Southwestern Portland Cement Company, do have and recover of and from the defendant Carl Leonardt the sum of $6,000, with interest thereon from the 31st day of January, A. D. 1915, at the rate of 6 per cent. per annum, for which let execution issue.

"Fifth. It is further ordered, adjudged, and decreed by the court that the plaintiffs W. D. Latta, J. A. Happer, E. E. Neff, and Dr. Ida Bishop, for the use and benefit of the Southwestern Portland Cement Company do have and recover of and from the defendant Felix Martinez the sum of $1,200, with interest thereon from the 31st day of January, A. D. 1915, at the rate of 6 per cent. per annum, for which let execution issue.

"Sixth. It is further ordered, adjudged, and decreed by the court that the Southwestern Portland Cement Company, its officers, directors, and agents, be, and the same are hereby ordered to at all times refrain from paying to the defendant Carl Leonardt, or his assignees, any dividend whatsoever upon 400 shares each of preferred and common stock of the 750 shares of preferred and common stock issued to the said Carl Leonardt in payment for the property situated at or near Victorville, in the state of California, and shall refrain from recognizing or counting any vote of the said 400 shares common stock upon any matter or subject concerning the affairs and management of said defendant company.

"Seventh. It is further ordered, adjudged, and decreed by the court that the said defendant, Carl Leonardt be and he is hereby forever restrained from voting the said 400 shares of common stock of the 750 shares of the common stock of the said defendant Southwestern Portland Cement Company, issued to him in payment for properties by him conveyed to the said defendant at or near Victorville, in the state of California, and from demanding or receiving or offering to demand or receive any dividends whatsoever on said 400 shares each of common and preferred stock of said defendant company in any manner whatsoever.

"Eighth. It is further ordered, adjudged, and decreed that this cause be dismissed and in all things discontinued as to C. W. Wilcox, Christine Garlick, and Crawford Harvie, independent executor of the estate of W. C. Harvie, deceased, and that they recover all costs in behalf incurred.

"Ninth. It is further ordered, adjudged, and decreed that the plaintiffs W. D. Latta, J. A. Happer, E. E. Neff, and Dr. Ida Bishop, recover of the defendants Southwestern Portland Cement Company and Carl Leonardt and Felix Martinez pay all costs by them respectively incurred.

"Tenth. That the officers of the court recover of and from the parties hereto the costs by them respectively incurred.'

The plaintiffs requested the court to state in writing and file findings of fact such as were found by the court in addition to the facts found by the jury and upon which the court based its judgment. Plaintiffs also requested the court to make up and file his conclusions of law. In response to such requests, the court made and filed findings of fact and conclusions of law. The following is a condensed statement thereof:

#### Findings of Fact.

1. That the Southwestern Portland Cement Company was incorporated under the laws of West Virginia and authorized by its charter and the laws of that state to acquire property and carry out the purposes for which it was incorporated at any place or places in the United States.

2. That the articles of incorporation were signed April 10, 1907, and filed with the Secretary of State of West Virginia on August 24, 1907, and from said last-named date became a corporation by the name and for the purposes set forth in the articles of incorporation.

3. That in conformity with the statutes of that state, the articles of incorporation provided that the principal place of business of said corporation should be located in the city of El Paso, Tex., and its chief works in the county of El Paso, Tex.

4. That the objects and purposes for which the corporation was formed are set forth in the third paragraph of the charter and are as follows: (See statement hereinafter made of the provisions of paragraph 3 of the articles of incorporation.)

5. The authorized capital stock of the corporation was fixed at $2,200,000, to be divided into 22,000 shares of $100 each, one-half of which was designated as common stock and one-half as cumulative 8 per cent. preferred stock, and it was provided that no dividends should be allowed or paid upon common stock until 8 per cent. had been paid upon the preferred stock.

6. It provided that the corporation should be managed and its affairs directed by a board of eleven directors.

7. (Unimportant.)

8. (Unimportant.)

9. That on and prior to April 10, 1907, defendant Courchesne was the owner of 900 acres of land containing valuable cement deposits.

10. That on April 10, 1907, A. Courchesne, Aman Moore, Carl Leonardt, and Felix Martinez entered into a written agreement which reads:

"This agreement, made and entered into on this the 9th day of April, 1907, between A. Courchesne, of El Paso, Texas, hereinafter styled party of the first part, and Aman Moore, of Ogden, Utah, party of the second part, and Carl Leonardt, of Los Angeles, California, and Felix Martinez, of El Paso, Texas, the last-named two acting as trustees for the stockholders of a corporation hereafter to be organized under the terms of this agreement, as well as for all the subscribers hereto for the uses, purposes and trusts herein expressed, the said trustees being hereafter described as parties of the third part, witnesseth:

"A. Courchesne, party of the first part, is the owner of the following described property situated in the county of El Paso and state of Texas: (Here follows description of various tracts of land.)

"II. The parties hereby agree and obligate themselves to incorporate under the laws of the state of West Virginia a corporation for the purpose of building, maintaining and operating a cement plant upon the property above described, said plant to be of the approximate value and cost of nine hundred thousand ($900,-000.00) dollars, said plant to be for the manufacture and sale of cement out of and from the material suitable for that purpose found and existing on the ground hereinbefore described and elsewhere in the county of El Paso and state of Texas and the adjoining and adjacent counties of the territory of New Mexico.

"III. The party of the first part, A. Courchesne, hereby agrees and obligates himself to make, execute and deliver to the parties of the third part, as trustees, a warranty deed or deeds to all of the above described property and now owned and held by him. The said Courchesne obligates himself to execute the deed or deeds in due and lawful form and he warrants that his wife will join him in the lawful execution thereof.

"IV. * * * The said Courchesne, party of the first part, hereby agrees and obligates himself that he and his wife will make, execute and deliver to the said parties of the third part as trustees, good and sufficient deed or deeds of conveyance to the property above described situated in El Paso county, Texas, on or before the first day of May, 1907, as follows, to wit: That is to say, he and his wife will so execute the said deed or deeds, placing it or them in the First National Bank of El Paso, Texas, in escrow and to be delivered by the said bank to the parties of the third part upon the payment to the said the First National Bank of El Paso, Texas, for the party of the first part, of the sum of fifty thousand ($50,000.00) dollars on or before the first day of August, 1907, the party of the first part agreeing to place with the said Bank at the time of delivery of the said deed or deeds to the said bank a complete abstract or abstracts of title to the property covered by said deed or deeds, it being hereby agreed and understood that the parties of the third part shall have the right to examine the said deed or deeds at any time, in person or by attorneys, and the right to withdraw said abstract or abstracts of title for examination by them. It being further agreed that should the title to the said property not be accepted, the abstract or abstracts shall be returned to the party of the first part and the deed or deeds likewise redelivered to him on demand after the first day of August, 1907. It is further agreed and understood that upon the party of the first part placing said deeds in the First National Bank of El Paso, Texas, on or before the first day of May, 1907, together with the abstract or abstracts of title above described, thereby tendering to the said parties of the third part an indefeasible title to the property above described in the county of El Paso and state of Texas, the party of the third part shall, on or before August 1, 1907, pay to the First National Bank of El Paso, Texas, for the credit of and to the use and benefit of the party of the first part, the sum of fifty thousand ($50,000.00) dollars. * * *

"VI. It is hereby agreed by the parties hereto, for the purpose of raising the said fifty thousand ($50,000.00) dollars for the purpose of paying for the said land, that they will, severally, pay to the said trustees on demand after the first day of July, and before the first day of August, 1907, the following sums, that is to say: The said Felix Martinez will pay to the said trustees the sum of five thousand ($5,000.00) dollars; the said A. Courchesne will pay to the said trustees the sum of twenty thousand ($20,000.00) dollars; the said Aman Moore and Carl Leonardt will jointly and severally pay to the said trustees the sum of twenty-five thousand ($25,000.00) dollars.

"VII. (This paragraph of the contract is immaterial.)

"VIII. It is hereby expressly agreed and understood that upon the payment to the said party of the first part of the sum of fifty thousand ($50,000.00) dollars and the acceptance by the party of the third part of the title to the land above described, that the said parties of the third part shall forthwith make, execute and deliver good and sufficient deed or deeds in law to the property above described to the corporation hereafter to be organized for the purpose of taking the said title and operating and maintaining said cement works to be known as the Southwestern Portland Cement Company, said corporation to be incorporated under the the laws of the state of West Virginia at which time the said corporation shall pay to the said parties of the third part, in trust for the subscribers hereto, the sum of one hundred thousand ($100,000.00) dollars in cash and cumulative preferred stock of the said corporation of the par value of two hundred thousand ($200,000.00) dollars and common stock of the said corporation of the par value of two hundred thousand ($200,000.00) dollars.

"IX. It is hereby agreed and understood that upon the surrender to the said parties of the third part of the said capital stock, preferred and common, and money, that it shall be the duty of the parties of third part to deliver the same to the subscribers hereto, as follows: That is to say, one-tenth of all the stock and money so delivered to them to Felix Martinez; four-tenths of all the stock and money so delivered to them to A. Courchesne; and five-tenths of all the stock and money so delivered to them to the said Aman Moore and Carl Leonardt jointly, it being further agreed and understood that the cumulative preferred stock be interest bearing at the rate of eight per cent. cumulative.

"X. It is further agreed and understood that the parties hereto obligate themselves to subscribe or cause to be subscribed certain portions of the capital stock of said corporation; that is to say, the said Leonardt and Aman Moore will jointly subscribe or cause to be subscribed two hundred and fifty thousand ($250,000.00) dollars of the capital stock; the said A. Courchesne will subscribe or cause to be subscribed two hundred thousand ($2,000.00) dollars of the said capital stock; and the said Felix Martinez will subscribe or cause to be subscribed fifty thousand ($50,000.00) dollars of the capital stock of said corporation."

(The remaining paragraphs of the contract are unimportant.)

Said contract between the parties mentioned was duly acknowledged on the date of its execution.

11. That the agreement mentioned in the foregoing paragraph and the articles of incorporation were signed by the incorporators at a meeting in El Paso, Tex., on April 10, 1907, and the contents of both documents were made known to all present at the meeting. The parties who signed the articles of incorporation were Aman Moore, Eugene Neff, J. F. Williams, O. J. Binford, Horace B. Stevens, Courchesne, and Martinez.

12. By general warranty deed dated July 26, 1907, Courchesne and wife conveyed the lands described in the above-mentioned contract to Leonardt and Martinez, trustees, for a recited consideration of $100,000 paid. The deed recites that the lands were taken by Leonardt and Martinez as trustees for the purpose of conveying the same to the Southwestern Portland Cement Company when the same shall have been organized and incorporated. This deed was filed for record July 30, 1907, and recorded August 12, 1907.

13. By general warranty deed dated July 30, 1907, recorded August 13, 1907, Leonardt and Martinez conveyed said lands to the Southwestern Portland Cement Company for a recited consideration of $100,000 cash paid, and the sum of $200,000 of preferred stock and $200,000 of common stock of said company.

14. It appears from the Minutes Book of the Southwestern Portland Cement Company that at a regular meeting of the board of directors of said company held July 30, 1907, the following resolution was adopted:

"Whereas, Carl Leonardt and Felix Martinez were duly appointed trustees by the organizers of the Southwestern Portland Cement Company; and,

"Whereas, as such trustees they purchased about nine hundred acres of cement property from A. Courchesne; and,

"Whereas, said property has turned out, after due and exhaustive investigation, to be the very finest material for the manufacture of cement, the said property to be purchased for the price of one hundred thousand ($100,000.00) dollars in cash, two hundred thousand ($200,000.00) dollars in common stock; and,

"Whereas, several parties have subscribed for one hundred thousand ($100,000.00) dollars to make up the cash payment:

"Now, therefore, in order to acquire the said property for the use and benefit of the said Southwestern Portland Cement Company hereby authorize and instruct the president and secretary of said company to issue one hundred thousand ($100,000.00) dollars of preferred stock of the company, together with one hundred thousand ($100,000.00) dollars corresponding common stock, and also to issue two hundred thousand ($200,000.00) dollars preferred stock with the corresponding shares of two hundred thousand ($200,000.00) dollars common stock in full payment and consideration for, said property, upon the execution of proper and sufficient deed, duly executed by said Leonardt and Martinez, trustees, in favor of said Southwestern Portland Cement Company, with instructions that the said stock be issued upon the order of the said Leonardt and Martinez, trustees, and that they be instructed to distribute the said stock to the subscribers herein mentioned."

15. (Unimportant.)

16. (Unimportant.)

17. That at each annual meeting of the stockholders of the Southwestern Portland Cement Company a financial statement and audit of the financial affairs of the corporation was read, and that in such financial statement and audit the consideration paid for the real estate conveyed by Leonardt and Martinez, trustees, to the corporation, was correctly shown.

18. That the conveyance of the real estate described in the deed of July 30, 1907, conveyed by Leonardt and Martinez, trustees, to the Southwestern Portland Cement Company, was accepted and ratified by the Southwestern Portland Cement Company after the filing of its charter by the Secretary of State of West Virginia and the issuance of its permit to do business in the state of Texas, by the taking and holding of said real estate, and the construction and operation of cement works and quarries thereon.

19. That on the 15th day of July, A. D. 1909, the Secretary of State of the State of Texas granted to the Southwestern Portland Cement Company a permit to manufacture Portland cement, and to purchase and sell all goods, wares, and merchandise used in such business.

20. That on or prior to the 7th day of December, A. D. 1914, a notice was sent to all of the stockholders of the Southwestern Portland Cement Company, advising them that at the regular stockholders' meeting to be held at El Paso, Tex., on the 18th day of January, 1915, being the regular annual meeting, a resolution would be offered, increasing the authorized capital stock of the corporation to $1,500,000 each of common and preferred stock and would be considered, for the purpose of acquiring a cement deposit and constructing a cement works in southern California.

21. That at a regular annual meeting of the stockholders which was held at El Paso, Tex., January 18, 1915, in accordance with said notice, more than 92 per cent. of the outstanding capital stock of the Southwestern Portland Cement Company was represented in person and by proxy including all of the plaintiffs in this suit, except Latta & Happer, who received said notice, but failed to attend the meeting.

22. That at the stockholders' meeting held January 18, 1915, Carl Leonardt, president of the company, outlined and recommended to the company the building of a cement plant at Victorville, in California, and offered to sell to the company certain real estate, cement deposits, and factory site, in consideration of 750 shares of the preferred stock of the company and 750 shares of the common stock of the company.

23. That after discussion and debate at said meeting of the stockholders, W. J. Mills offered the following resolution: "That it be authorized to increase the capital stock of the Southwestern Portland Cement Company from one million one hundred thousand ($1,100,000.00) dollars to one million four hundred thousand ($1,400,000.00) dollars each of common and preferred stock, and that the same be first offered to the stockholders of the company three thousand shares of common stock and three thousand (3,000) shares of preferred stock, together with stock now remaining in the treasury, and that the preferred stock be sold at not less than par, and that the money derived from the sale of this stock be used for the purpose of erecting the Victorville plant and acquiring the land." Said resolution was unanimously adopted.

24. That in pursuance of such action of the stockholders' meeting of January 18, 1915, Carl Leonardt conveyed to the Southwestern Portland Cement Company certain cement deposits, mining claims, factory sites, and right of way at and near Victorville, in San Bernardino county, Cal., and received in payment therefor 750 shares of the common stock of the Southwestern Portland Cement Company, and 750 shares of the preferred stock of the Southwestern Portland Cement Company.

25. That said 750 shares of preferred stock and 750 shares of common stock together were of the reasonable value of $75,000.

26. That subsequent to the institution of this suit a general meeting of the stockholders of the Southwestern Portland Cement Company was held in El Paso, Tex., pursuant to the following notice:

"To the Stockholders of the Southwestern Portland Cement Company: The undersigned stockholders of the Southwestern Portland Cement Company, under the laws of West Virginia, being the holders of more than one-tenth of the capital stock of said corporation, acting in conformity to the statute of West Virginia, and the undersigned president of the company, acting in conformity to the by-laws of said corporation, do hereby call a general meeting of the stockholders of the said Southwestern Portland Cement Company, to be held at the principal office of said corporation at room 502 Two Republics Life Bldg., in the city of El Paso, in El Paso county, Texas, Saturday, the 28th day of August, A. D. 1915, at eleven o'clock a. m., to consider and decide upon the following matters:

"First. Shall the charter of said corporation be amended to authorize the construction and operation of a cement plant and other works at or near Victorville, in San Bernardino county, California, or anywhere else?

"Second. Shall the charter of said corporation be amended to authorize said corporation to purchase the whole or any part of the capital stock of properties of the Mojave & Northern Railway Company, or to authorize said corporation to incorporate a railway company and construct a railway for the use of said company from the deposit to the plant and to connect with any other common carrier?

"Third. Shall the stockholders ratify the amendment of the charter of said corporation, and the action of the stockholders' meeting, held at El Paso, January 18, 1915, and the action of the directors' meeting, held at Los Angeles, California, June 17, 1915, by which the charter of said corporation was amended to increase the capital stock thereof to the extent of three hundred thousand ($300,000.00) dollars additional preferred stock.

"Fourth. Shall the stockholders of said corporation ratify the action of the directors' meeting held at Los Angeles, California, June 17, 1915, which carried out the instructions of the stockholders' meeting, held at El Paso, January 18, 1915, in purchasing from C. Leonardt, president of the company, certain cement properties

and railroad right of way, located at and near Victorville, in San Bernardino county, California?

"Fifth. To consider the alteration or amendment or adoption of by-laws for the government of said corporation.

"Sixth. To transact any and all other corporate business which may be submitted to such stockholders' meeting.

"A copy of this notice shall be mailed to all of the stockholders of said company at least thirty days before the time set for the above meeting, as aforesaid, addressed to the last address furnished the secretary of the company, postage prepaid, and the same shall be published in some newspaper of general circulation published in the capital city of the state of West Virginia.

"C. Leonardt, Pres.
"Mrs. A. Krakauer, JAK., Stockholder.
"Robert Krakauer, Stockholder.
"O. J. Binford, Stockholder.
"Elizabeth Gilliland, Stockholder.
"F. H. Powell, Stockholder.
"A. Courchesne, Stockholder.
"C. Leonardt, Stockholder.
"C. C. Merrill, Stockholder.
"Wm. Lacy, Stockholder.
"W. W. Kayser, Stockholder.
"El Paso, Texas, July 23, 1915."

Which said notice had been given in the manner and form prescribed by the laws of the state of West Virginia, and the by-laws of the corporation, and at this meeting it was found that 8,261⅔ shares of the outstanding capital stock of the corporation was present in person or by proxy, including all the plaintiffs in this cause.

27. That at said stockholders' meeting a resolution was passed to amend paragraph II of the articles of incorporation of the company, which amendment was in words and figures as follows, to wit: "Be it resolved: That section II of the articles of incorporation of the Southwestern Portland Cement Company be amended so as to hereafter read as follows: II. The principal place of business of the said corporation shall be located in the city of El Paso, El Paso county, state of Texas, and its chief works will be located in the county of El Paso, in the state of Texas, but notwithstanding said corporation may construct, operate and maintain cement works at and near Victorville, in San Bernardino county, California, and may acquire and own property to carry out any of the purposes for which it was incorporated, in San Bernardino county, California, or at any other place or places as may be authorized by the stockholders of said corporation." Upon the adoption of which resolution 7,879 votes were cast in the affirmative and 482 were cast in the negative.

28. That at said stockholders' meeting, held at El Paso, August 28, 1915, the action of the directors in acquiring the cement deposits and other properties in San Bernardino county, Cal., was taken up for reconsideration. The nature, extent, and quality of the deposits and the availability of the site and the price paid therefor by Carl Leonardt were laid before the stockholders' meeting and discussed at length. Carl Leonardt retired from the meeting. Thereafter, at said meeting a motion was duly made and carried which was in words and figures as follows, to wit: "That this stockholders' meeting do ratify the action of the directors' meeting held at Los Angeles, California, June 17, 1915, which purported to carry out the instructions of the stockholders' meeting held at El Paso, January 18, 1915, in purchasing from Mr. C. Leonardt, president of the company, certain cement properties and railroad right of way located at or near Victorville, San Bernardino county, California." That upon the adoption of this motion, 5,786½ votes were cast in the affirmative and 467 votes in the negative, Mr. Leonardt being absent and not voting.

29. That at the time plaintiffs acquired stock in defendant corporation, they knew, or by the exercise of ordinary diligence could have known, of the original stock issue, issued to the trustees in payment for the Courchesne property and the purpose of such issue.

30. That John Treanor is the manager of the Riverside Portland Cement Company, of Riverside, Cal., and that he has paid and agreed to pay all of the attorneys' fees of the attorneys for plaintiffs in this cause, and that he has paid all the fees and expenses of experts who have testified on behalf of plaintiffs in this cause, and all of the costs of taking depositions, affidavits, and other evidence on behalf of plaintiffs in this cause, and that he has paid all court costs incurred by plaintiffs, or any of them, in this cause.

31. That the said John Treanor came to El Paso anterior to the institution of this suit, and encouraged and counseled with plaintiffs about bringing this suit.

32. That all of the stock issued to Carl Leonardt, Felix Martinez, and A. Courchesne, in payment for the Courchesne property, was issued prior to the 1st day of January, A. D. 1908, and more than four years prior to the institution of this suit, and that the action to recover of Carl Leonardt, Felix Martinez, and A. Courchesne any of said stock or the value thereof, or the dividends paid thereon, is barred by the four years' statute of limitation.

33. That the agreement of April 10, 1907, between Aman Moore, C. Leonardt, Felix Martinez, and A. Courchesne, was open and notorious, and that no attempt was made to conceal the terms thereof, and that plaintiffs were guilty of laches in waiting eight years after the issuance of said stock before instituting this suit.

34. That the Southwestern Portland Cement Company issued to Carl Leonardt 750 shares of the preferred stock and 750 shares of the common stock of the Southwestern Portland Cement Company in payment for the properties in San Bernardino county, Cal.

35. That in January, 1915, the directors of the Southwestern Portland Cement Company paid to Carl Leonardt, as president of the Southwestern Portland Cement Company, the sum of $6,000 back salary for the year 1914, and paid Felix Martinez, as vice president of said company, the sum of $1,200 back salary for the year 1914, and that the service rendered by the said Leonardt and Martinez, as president and vice president, were reasonably worth the sums so paid them.

36. That by the terms of the statute of the state of West Virginia, under which the Southwestern Portland Cement Company was incorporated, it is provided as follows: "Any subscriber to the capital stock of any such mining or manufacturing corporation may pay for the same by the transfer and conveyance to such corporation of real and personal property, or both, proper or necessary for the uses of the corporation, upon such terms as may be mutually agreed upon. All stock so issued shall be fully paid and not liable to any other call or assessment, and in the absence of actual fraud in the transaction, the valuation of the property so purchased shall be conclusive."

37. That all of the stock now owned by the plaintiffs or any of them, or owned by them at the time of the institution of this suit, was issued subsequent to the 1st day of November, A. D. 1909.

38. That ever since the organization of the Southwestern Portland Cement Company when a share of preferred stock has been issued it has invariably been accompanied by a corresponding share of common stock including the stock issued to plaintiffs.

The trial court's conclusions of law are as follows:

First. That the defendant Southwestern Portland Cement Company was and is authorized by the terms of its charter and the laws of the state of West Virginia to purchase cement deposits and operate cement works, and to acquire real

and personal property, and carry out the purposes for which said company was incorporated, in San Bernardino county, Cal.

Second. That by the terms of the written contract entered into between Aman Moore, Carl Leonardt, Felix Martinez, and A. Courchesne, under date of April 10, 1907, A. Courchesne bound himself to sell the property known as the Courchesne property, comprising about 900 acres of land, on which the plant of the company is situated, for $100,000 in cash and $200,000 in preferred stock and $200,000 in common stock of the Southwestern Portland Cement Company, and that the said Courchesne agreed $200,000 of said common stock should be issued to Felix Martinez, Aman Moore, Carl Leonardt, and A. Courchesne, in proportion to the amount of additional stock, in the sum of $500,000, in said Southwestern Portland Cement Company, which they should purchase or sell at par.

Third. That said purchase and sale of the Courchesne property was made in good faith, and was not fraudulent in law, and that action to cancel said stock or to recover dividends thereon is barred by the four years' statute of limitation.

Fourth. That no injunction will lie to restrain the Southwestern Portland Cement Company from constructing and operating cement works in the state of California.

Fifth. That the jury having found that the property acquired by the Southwestern Portland Cement Company from Carl Leonardt, in San Bernardino county, Cal., is of the value of $35,-000, the Southwestern Portland Cement Company should be enjoined from recognizing or paying dividends on the remaining 400 shares of preferred stock issued to the said Leonardt, and should be enjoined from voting said stock or collecting the dividends thereon.

Sixth. That the payment of the back salary to Carl Leonardt, as president of the Southwestern Portland Cement Company, and to Felix Martinez, as vice president thereof, for the year 1914, was without legal authority, and that the company should recover the sums so paid with 6 per cent. interest from January 31, 1915.

Seventh. That the purchase price and amount of stock paid by the Southwestern Portland Cement Company, in consideration of the conveyance to it of the Courchesne property having been placed of record on the minutes of the corporation at the time of the transfer, as well as having been placed of record in the deed records of El Paso county, Tex., and notice thereof having been given at each annual stockholders' meeting of the stockholders of the corporation, in the financial statement rendered to such meetings, the plaintiffs were guilty of laches in not proceeding to question or cancel such issue of stock for eight years after the date of such issuance.

From the judgment entered in the cause, both parties prosecute this appeal.

We will first take up and dispose of the assignments presented by the defendants.

### Opinion.

The first and second assignments complain of the action of the court in overruling the plea in abatement. It is asserted that this plea should have been sustained because the undisputed evidence discloses: First. That John E. Treanor, manager of the Riverside Portland Cement Company, a rival company and business competitor of defendant company, was the real party plaintiff and in fact managed, conducted, and defrayed the cost of the litigation for the purpose of injuring and harassing the defendants. Second.

That the plaintiffs had conspired to bring this suit for the purpose of injuring and harassing the defendants, depreciating the stock of the defendant company, and to fraudulently obtain access of the books, records, accounts, and trade secrets of the defendant company. Supporting such assignments, it is asserted as propositions of law that a court of equity will not entertain a suit against a corporation, its agents or officers, instituted and carried on at the cost of and for the benefit of a rival corporation; that stockholders of a corporation cannot maintain a suit in equity against the company for the purpose of injuring it or benefiting a rival corporation; and that an action will not lie at the instance of stockholders to obtain access to the books, records, accounts, and trade secrets of a corporation, when the same is sought in the interest of a rival corporation.

[1] The correctness of the legal propositions submitted may be conceded, but they and the assignments rest upon false premises of fact. It is very true that the attorneys' fees, court costs, expenses of paying experts to examine the Leonardt properties at Victorville, the taking of depositions, and practically all expenses of every character, were to be paid for by Mr. John G. Treanor, manager of the Riverside Portland Cement Company. It may be true, too, that most of plaintiffs' witnesses were employés of the Riverside Company, and that practically all of plaintiffs' witnesses acted under the direction of Mr. O. K. Dunham, an employé of the Riverside Portland Cement Company. But the question is: Was the suit instituted and prosecuted by plaintiffs in good faith for the protection of their own interests and that of other stockholders? Cook on Corporations, § 736; Beshoar v. Chappell, 6 Colo. App. 323, 40 Pac. 247; Carver v. Southern, etc., 78 N. J. Eq. 81, 78 Atl. 240. The answer of the jury to the first question in effect resolved this issue in plaintiffs' favor, and the evidence abundantly supports such a view. It is very true that the Riverside Company is interested in preventing the establishment of a rival plant by the defendant company. On the other hand, the evidence is that the plaintiffs, in good faith, believed that it would be detrimental to the best interests of the defendant company to establish such a plant. And they are not without ample evidence that their belief was well grounded. Entertaining such a belief, they had a perfect legal right in protection of their corporate interests to institute and prosecute a suit to prevent the establishment of the plant at Victorville. But they were minority stockholders with comparatively small holdings, and they could not afford to incur the heavy expense incident to the litigation. Under such circumstances, we see no legal objection to their availing themselves of the selfish interest of a rival corporation to procure funds to prosecute the

litigation. Ffooks v. Railway Co., 1 Sm. & G. 142; Sandford v. Railway Co., 24 Pa. 378, 64 Am. Dec. 667; Coleman v. Railway Co., 10 Bea. 1, 50 Eng. Rep. 481; Zeigler v. Hughes, 55 Ill. 288; Dismore v. Central R. Co. (C. C.) 19 Fed. 153.

It is not apparent what pertinency there is in the proposition advanced by defendants that an action will not lie at the instance of the stockholders of a corporation to obtain access to the books, records, accounts, and trade secrets of the corporation, when the same is sought in the interests of a rival corporation. Such is not the nature of this suit, and no such consequence results from the action or the judgment rendered.

Error is next assigned to the overruling of a general demurrer directed against the original and supplemental petitions. Various reasons are advanced in support of the position that the petitions fail to state a cause of action which will be disposed of in the order presented. The first proposition is that the courts of one state are without jurisdiction or authority to manage or control the internal affairs of a corporation chartered under the laws of another state.

[2, 3] If the petition stated a good cause of action in any particular, it was properly overruled. However correct the proposition stated may be, it can have no application to all the varying phases of the petition. The defendant company, though a foreign corporation, was expressly authorized by its charter powers to do business in this state and had obtained the necessary permit to do business here from the Secretary of State of Texas. It was actually doing business in the state and had officers and agents stationed here. The courts of Texas therefore had full and complete jurisdiction over its person. The petition alleged facts showing unlawful payments made to Leonardt and Martinez out of corporate funds. It also alleged a disbursement of more than $6,000 from the surplus funds of the corporation acquired in the course of its business, which disbursement was made for the benefit of the Victorville plant when there was authority only to spend money for that purpose from the moneys derived from the sale of stock. Certainly, as to these phases of the petition, it was good against a general demurrer.

The next proposition is:

"Plaintiffs having alleged that the majority stockholders of the defendant corporation had decided on a course of action which plaintiffs sought to enjoin for fraud, such majority stockholders were necessary parties to the suit, and plaintiffs' petition was fatally defective for want of the proper parties defendant."

[4] Appellants do not present any authority in support of this contention. We think that, in a suit against a corporation by a minority stockholder to enjoin an act which is in fraud of his rights, it is not necessary to join as party defendants the majority stockholders at whose instance the proposed action is about to be taken.

[5] The next proposition is that plaintiffs' petition showing on its face that defendants' property in El Paso county, Tex., had been acquired more than four years prior to the filing of their petition, and that the issuance of stock at the agreed price in payment therefor was barred by the four years' statute of limitation, such petition was in that respect fatally defective. The fact that a petition discloses upon its face that it is barred by limitation does not subject it to general demurrer. Gathright v. Wheat, 70 Tex. 740, 9 S. W. 76.

[6] The next proposition is that so much of plaintiffs' petition as sought to enjoin the acquisition of property in California at the price agreed upon between Leonardt and the defendant corporation was fatally defective, for the reason that the court was without jurisdiction to enjoin defendant corporation, organized under the laws of the state of West Virginia, from acquiring real estate in California, and for the further reason that, under the statutes of West Virginia set out in plaintiffs' supplemental petition, defendant corporation was expressly authorized to acquire real or personal property, upon such terms as might be mutually agreed upon, and to issue fully paid stock therefor. This presents an academic question. The court's decree, in the second paragraph thereof, expressly denied the plaintiffs any such relief. So it would be useless to determine whether the petition stated a cause of action entitling the plaintiffs to such relief. This observation likewise disposes of the fourth assignment.

[7] The next proposition is that a stockholder, contesting the validity of corporate acts, must allege that he was the holder of stock prior to the commission of the acts of the corporation complained of, or that his stock has since devolved upon him by operation of law. If this were a suit in the federal court, it may be that, by virtue of the equity rules, the failure to make such an allegation would make the petition objectionable. But there is no rule of like character in Texas. As against a general demurrer, every reasonable intendment is indulged in favor of the pleading attacked; therefore it will be presumed that plaintiffs were stockholders at the time some of the acts complained of were committed. Indeed, the fair inference is that some of the plaintiffs were so.

The fifth assignment also complains of the overruling of the defendants' general demurrer and is disposed of by the observations made above.

The sixth assignment submitted as a proposition is that the court erred in rendering judgment upon the special finding of the jury that the cement property and deposit at or near Victorville, Cal., are worth only the

sum of $35,000, and in effect canceling $40,-000 worth of the stock issued to the defendant Leonardt in payment for said property, for the reason that said finding and judgment is contrary to the overwhelming weight of the testimony concerning the value of said cement deposit and cement property near Victorville. Without undertaking to detail the evidence upon this issue, we think there is sufficient to warrant the jury in making the finding it did. We cannot set it aside.

The seventh, eighth, ninth, and tenth assignments complain of the sixth and seventh paragraphs of the decree which in effect canceled 400 shares of the defendant corporation's common and preferred stock, the same being a part of 750 shares which had been issued to Leonardt in payment for the Victorville property. The par value of the 750 shares was $75,000. The jury found that the Victorville property was not worth $75,-000, but was in fact worth only $35,000.

Section 2857, c. 53, of the Annotated Code of West Virginia, provides:

"Any subscriber to the capital stock of any such mining or manufacturing corporation may pay for the same by the transfer and conveyance to such corporation of real or personal property, or both, proper or necessary for the uses and purposes of the corporation, upon such terms as may be mutually agreed upon. All stock so issued, shall be fully paid and not liable to any further call or assessment, and, in the absence of actual fraud in the transaction, the valuation of the property so purchased shall be conclusive; but it shall be the duty of the corporation to have its minutes or other permanent records to show with reasonable detail the items of the property in payment for which stock or bonds were so issued."

The evidence discloses the terms upon which Leonardt conveyed to the Southwestern Portland Cement Company the properties at or near Victorville were agreed upon at the stockholders' meeting held at El Paso, January 18, 1915, and the minutes of said meeting set forth with reasonable detail the items of the property in payment for which such stock was issued.

The directors' meeting held at Los Angeles, Cal., June 17, 1915, carried out the instructions of the stockholders' meeting held at El Paso, Tex., January 18, 1915, and set forth in detail the property for which such stock was to be issued.

The stockholders' meeting, held at El Paso, August 28, 1915, ratified the action of the stockholders' meeting of January 18, 1915, and of the directors' meeting of June 17, 1915, relative to the purchase of the Victorville property and the terms of the purchase.

The minutes of the said several stockholders' meetings cited above show that the offer of Leonardt concerning the sale of the cement deposits and the other properties at and near Victorville, to the Southwestern Portland Cement Company, was made in open meetings of the stockholders and directors; that full discussion of the value and character of the properties and the feasibility of operating a cement plant thereon were had at each and all of said meetings; that the price paid by Leonardt for the properties, as well as the extent, character, and quality of the cement deposits, were fully laid before such meetings; that no material facts were concealed or withheld from the meetings; and that Leonardt did not vote or participate in the action of the stockholders' meetings held at El Paso, August 28, 1915, in which the acquisition of said properties and the construction of the Victorville plant was finally determined and indorsed, and the proceedings of the former meetings ratified. There was no evidence that any fraud was practiced upon the stockholders or directors at any of said meetings.

Under the jury's findings, it must be accepted as a fact that the Victorville property was taken at an overvaluation; but, under the evidence, it is clear that such overvaluation was not intentional or fraudulent. There is an abundance of testimony given by parties qualified to testify to the value of the property that it was worth from $75,000 to $334,000 for the purpose for which the defendant corporation desired to use it. It was shown that Leonardt had been offered and refused $75,000 for a one-half interest in the property. The jury does not find that there was any intentional or fraudulent overvaluation of the property. The court, in its findings of fact, fails to find any intentional or fraudulent overvaluation. Indeed, such findings preclude the idea that the court made any such findings. It appears therefrom that at the stockholders' meeting held at El Paso in January, 1915, all of the plaintiffs except Latta & Happer were present and participating. At this meeting, it was decided to purchase the deposits and erect a cement plant at Victorville, and that, after difference of opinion and untrammeled debate, the proposal to acquire said property and build such plant was unanimously adopted. Ninety-two per cent. of the corporation was represented at this meeting. As to the two plaintiffs not present at the meeting, Mr. Happer testified that both he and Mr. Latta were advised of the purpose of said meeting, before it was held, and that they did not attend. Subsequent to the institution of this suit, a general meeting of the stockholders was held in El Paso on August 28, 1915, and the action of the directors in acquiring the Victorville property came up for reconsideration. The matter was thoroughly canvassed, and the action of the directors was ratified by a vote of 5,786½ to 467. Leonardt withdrew when the vote was taken and his stock was not voted.

[8, 9] The fifth paragraph of the court's conclusions of law discloses that the practical cancellation of the 400 shares of stock by the sixth and seventh paragraphs of the decree was decreed upon the theory that such cancellation was the legal consequence prop-

erly resulting from the jury's finding that the Victorville property was worth only $35,000. This was error. In order to invalidate an issue of stock of defendant corporation, issued for property taken at an overvaluation, it must be shown, not only that there was an overvaluation, but also that such overvaluation was intentional and fraudulent. Section 2857, West Virginia Code, quoted above; 1 Cook on Corporations (7th Ed.) § 351; Cole v. Adams, 92 Tex. 171, 46 S. W. 790. And such fraud will not be implied from a mere finding that the property was in fact worth less than the par value of the stock. 1 Cook on Corporations (7th Ed.) § 36, at p. 181; Horton v. Sherrill, etc., 147 Ky. 226, 143 S. W. 1053. A corporation may lawfully issue its stock in payment for property conveyed to it. Of necessity, the representatives of the corporation must be vested with the authority to value the property which it is proposed to acquire. When they do so fairly and honestly and issue stock in payment therefor, the par value of which is equal to the valuation placed by them upon such property, such transaction cannot be set aside, simply because the property in fact was overvalued. Gas Co. v. Berry, 113 U. S. 322, 5 Sup. Ct. 525, 28 L. Ed. 1003.

[10] The cement company is not a domestic corporation, but a foreign corporation, incorporated under the laws of West Virginia. In issuing its capital stock, it must necessarily be governed by the law of West Virginia. Section 2857 of the Code of that state, quoted, above, gives to the subscriber of the capital stock of such a corporation the right to pay for same by conveyance of property upon such terms as may be mutually agreed upon, and provides that, in the absence of actual fraud in the transaction, the value of the property so purchased shall be conclusive. Those statutes of our state (articles 1126–1145) requiring certain proof to be made to the Secretary of State of the cash value of property which it is proposed to give in payment for stock can have no application here. If the issuance of 750 shares of stock to Leonardt in payment for the Victorville property would be in violation of article 1146, R. S., which forbids the issuance by a foreign corporation, doing business in Texas, of stock in payment for property which is not reasonably worth at least the sum at which it is taken, such fact would only authorize the forfeiture of the corporation's permit to do business in Texas. The courts of Texas cannot undertake to restrain the issuance of stock issued by the company in strict conformity with the laws of West Virginia.

The minority opinion assumes that the trial court found there was fraud in the transaction. His findings of fact do not so show. They preclude the idea of fraud. There is no evidence of fraud. In this condition of the record, it cannot be assumed that there was a fraudulent overvaluation of the Victorville property and that the trial court so found.

It follows that the assignments complaining of the sixth and seventh paragraphs of the decree are well taken. Under the view indicated, it becomes unnecessary to pass upon other propositions advanced by defendants in support of the seventh assignment.

[11] The eleventh and twelfth assignments complain of that portion of the judgment decreeing a recovery of the moneys paid Leonardt and Martinez as salaries for the year 1914. Whether or not the parties mentioned were entitled to pay for their services depended upon the existence of a contract to compensate them therefor. It is not contended that any express contract existed. If they were entitled to receive the payments made to them, it was by virtue of an implied contract. The rule, in the absence of an express contract, is stated in Pew v. Bank, 130 Mass. 391, as follows:

"A bank or other corporation may be bound by an implied contract in the same manner as an individual may. But, in any case, the mere fact that valuable services are rendered for the benefit of a party does not make him liable upon an implied promise to pay for them. It often happens that persons render services for others which all parties understand to be gratuitous. Thus, directors of banks and of many other corporations usually receive no compensation. In such cases, however valuable the services may be, the law does not raise an implied contract to pay by the party who receives the benefit of them. To render such party liable as a debtor under an implied promise, it must be shown, not only that the services were valuable, but also that they were rendered under such circumstances as to raise the fair presumption that the parties intended and understood that they were to be paid for; or, at least, that the circumstances were such that a reasonable man in the same situation with the person who receives and is benefited by them would and ought to understand that compensation was to be paid for them."

This statement of the rule is quoted with approval by Chief Justice Fuller in Fitzgerald, etc., v. Fitzgerald, 137 U. S. 98–113, 11 Sup. Ct. 36, 34 L. Ed. 608. Tested thereby, we think the court did not err in rendering judgment for the moneys so paid to Leonardt and Martinez. The evidence is insufficient to show that there was an implied contract to pay for such services. The same services had been rendered by Leonardt and Martinez ever since the organization of the company a number of years previously. No salary had ever been paid them, and it is evident that the parties did not intend or understand that they were to be paid therefor. The payment of the salaries for the year 1914 was without consideration, and judgment therefor was properly rendered. 3 Cook on Corporations (7th Ed.) §§ 2082, 2083; 10 Cyc. 899.

This disposes of the assignments presented by the defendants. We will now consider those urged by the plaintiffs.

The first assignment is:

"The court erred in failing to find, under the laws of West Virginia and defendant's charter,

that the act of building the cement plant at Victorville, Cal., is ultra vires of the defendant corporation, for the reason that defendant had no right under its charter and under the laws of West Virginia to have two chief works, or have chief works at any place except in El Paso county, Tex., and such was the contract entered into by the stockholders in becoming members of said corporation."

The proposition subjoined to the assignment reads:

"Under the charter of the Southwestern Portland Cement Company, it is ultra vires of said corporation to establish and maintain a cement plant at Victorville, Cal."

Paragraph 2 of the articles of incorporation of the Southwestern Portland Cement Company reads:

"The principal place of business of said corporation shall be located in the city of El Paso, county of El Paso and state of Texas, and its general works will be located in the county of El Paso, state of Texas."

Subsequent to the filing of the suit and prior to final hearing, this paragraph of the charter was amended. The amendment is shown in a certificate of the Secretary of State of West Virginia which reads as follows:

"I, Stuart F. Reed, Secretary of State of the State of West Virginia, hereby certify that Felix Martinez, vice president of the Southwestern Portland Cement Company, a corporation created and organized under the laws of the state of West Virginia, has certified to me under his signature and the corporate seal of said corporation, that at a meeting of the stockholders of said corporation, regularly held in accordance with the requirements of the law of said state, at the office thereof, in the city of El Paso, Texas, on the 28th day of August, 1915, at which meeting a majority of stock of such corporation being represented by the holders thereof in person or by proxy and voting for the following resolution, the same was duly and regularly adopted and passed, to wit: 'Be it resolved, that section II of the articles of incorporation of the Southwestern Portland Cement Company be amended so as to hereafter read as follows: II. The principal place of business of the said corporation shall be located in the city of El Paso, El Paso county, state of Texas, and its chief works will be located in the county of El Paso, in the state of Texas, but notwithstanding said corporation may construct, operate and maintain cement works at and near Victorville, in San Bernardino county, California, and may acquire and own property to carry out any of the purposes for which it was incorporated in San Bernardino county, California, or any other place or places as may be authorized by the stockholders of said corporation.'

"Wherefore, I do declare that the principal office or place of business of said corporation shall hereafter be in the city of El Paso, in the county of El Paso and state of Texas, and may own and maintain branch works at and near Victorville, San Bernardino county, California."

Paragraph 3 of the charter provides that:

"The objects and purposes for which this corporation is formed are as follows, to wit: For the purpose of locating, acquiring, holding, operating and disposing of quarries, mines and clay lands of every nature and description * * * roads, tramways, railroad and rights of way; and for the purpose of carrying on the business of mining, quarrying, tunneling, milling, coal mining, lumbering, tramming, railroading, contracting for and performing all kinds of construction work as well as subcontracting and subletting the same, buying, selling and handling clay, manufacturing, buying, selling and handling lime, manufacturing, buying, selling and handling cement and artificial stone, and pipe and tile, and all cement products and products wherein cement is used; * * * and for the purpose of constructing, purchasing, using and maintaining buildings, mills and machinery for the manufacturing and handling of cement, artificial stone, pipe and tile, and all cement products and products wherein cement is used, for manufacturing and handling lime * * * and for the purpose of acquiring, owning, possessing and enjoying so much other real and personal property as shall be necessary for the transaction of the business of the company * * * and for the purpose of doing all things necessary to exercise such other rights, powers and privileges commonly belonging to, or are usually exercised by a corporation engaged in the business of pursuits herein enumerated."

Section 2916 of the West Virginia Code is as follows:

"Sec. 2916. *Principal Office—Meetings—Notice—Attorneys at Other Places.*—23. The stockholders or directors of any corporation formed under or accepting the provisions of this chapter, may hold meetings for the transaction of the lawful business of the corporation, including the first general meeting for the purposes of organization, and keep the principal office of such corporation either in or out of this state. But no meeting of stockholders shall be held at any other place than the principal office of the corporation, unless the by-laws so provide, without the authority of the stockholders, and no meeting of the stockholders or of the directors, except as provided in the by-laws, or by section fifty-one of chapter fifty-three, of the Code, shall be held without reasonable notice. The principal office of the corporation shall be taken and deemed to be at the place fixed by the agreement and the certificate of incorporation, or as located according to the provisions of section twenty-one of this chapter. But notwithstanding the location of the principal office, any corporation may transact business and have an office or offices at any other place, and may own property and carry out the purposes for which it was incorporated at any other place or places."

We quote the following statutory provisions from the West Virginia Code:

"Sec. 2811. Chap. 52: Every corporation as such shall have succession by its corporate name for the time limited in its charter * * * and make ordinances, by-laws, and regulations for the government of its council, board, officers and agents, and the management and regulation of its property and business.

"Sec. 2812. Chap. 52. The powers mentioned in the preceding section, or otherwise granted to any corporation, shall be limited by the purposes for which it is incorporated, and no corporation shall engage in transactions or business not proper for those purposes. * * *"

The law of the state contains statutory requirements as to the things every charter shall state. Section 2899, c. 54, requires the charter to state:

"II. The location of its principal place of business and of its chief works, stating as to its principal place of business, the name of the town or city, and street and number, if number there be, the county and state, territory or country; and as to its chief works (if it have or contemplates having such) if in this state, the district and county in which located; and if not in this state, the state, territory or country in which they are or will be, located. * * * Second. The principal place of business of said

corporation shall be located at (here insert town or city and street and number, if any) in the county of ——— and state of ———; and its chief works shall be located in the (here insert district and county if in this state, and if not in this state, then insert state, territory or country in which the chief works are located)."

Section 2914, c. 54, provides:

"Any corporation * * * may by resolution, change the place of its principal office or its chief works."

Section 1257, c. 32, is as follows:

"124. For convenience in classification for prescribing and assessing license tax on charters or certificates of incorporation, corporations are divided into two classes, domestic and foreign. A domestic corporation is (a) one incorporated by or under the laws of this state, or (b) under the laws of the state of Virginia before the twentieth day of June, eighteen hundred and sixty three, and which has its principal place of business and chief works (if it have chief works) in this state. Every other corporation is a foreign corporation. Domestic corporations are subdivided into two classes, resident and nonresident. A resident corporation is a domestic corporation whose principal place of business and chief works (if it have chief works) are located within this state, and a nonresident corporation is a domestic corporation whose principal place of business or chief works is located without this state. The words 'chief works' as used in this chapter include shops, factories, mines, manufacturing plants or any building or other place where mechanics, artisans or laborers are employed."

[12] As is shown by the foregoing statement, we think it clear that, under its articles of incorporation and the laws of West Virginia, the cement company was authorized to own property and carry out the purposes for which it was organized at any other place or places than El Paso. It was not limited in its operations to El Paso. This is certainly true under amended paragraph 2 of its charter, and we think the original paragraph 2 was broad enough to authorize it to acquire and operate the Victorville property in California. The acquisition and operation of that property is not at all inconsistent with the continued maintenance of the chief works at El Paso.

Section 2916, above quoted, plainly provides that, notwithstanding the location of the principal office, any corporation may transact business and have an office or offices at any other place, and may own property and carry out the purposes for which it was incorporated at any other place or places.

Plaintiffs lay stress upon that portion of section 1257, c. 32, which says:

"The words 'chief works' as used in this chapter include shops, factories, mines, manufacturing plants or any building or other place where mechanics, artisans or laborers are employed."

This definition of "chief works" is limited to that chapter which seems to pertain to the question of taxation. The defendant company seems to have been incorporated under another chapter, and section 1257 does not seem to relate at all to any question of corporate power. For the reasons indicated, all assignments predicated upon the theory that the acquisition of the Victorville cement properties and the establishment and operation of a cement manufacturing plant there are ultra vires of the corporation are overruled.

For reasons assigned above in sustaining defendants' seventh, eighth, ninth, and tenth assignments, we now overrule the plaintiffs' fourth assignment.

The fifth assignment is vague and indefinite. But as we understand the same, it is without merit and is overruled.

The sixth assignment reads:

"The court erred in not enjoining defendants and in not canceling all of the stock issued for the Victorville project on account of the unlawful act of said corporation in giving to defendant Leonardt stock of the corporation of greater value than the property conveyed by him to said corporation."

This is without merit. The mere fact that the jury has found that the Victorville property is worth less than the par value of the 750 shares of stock issued to Leonardt in payment therefor does not invalidate the transaction, in the absence of an intentional and fraudulent overvaluation. The directors and a large majority of the stockholders have formally and in good faith decided that the property was worth the stock issued therefor. This phase of the case was passed upon in sustaining the seventh, eighth, ninth, and tenth assignments of the defendants.

[13] The seventh assignment complains of the refusal to cancel and annul the increase of the capital stock of the defendant corporation, because it is contended that such increase was made for the unlawful purpose of acquiring the capital stock of a railway company. In the first place, the resolution of the stockholders providing for such increase shows that the increase was "for the purpose of erecting the Victorville plant and acquiring the land." In the second place, if the stock was about to be issued for an unauthorized purpose, the proper remedy would be to enjoin such issuance. It would not be proper for the court to undertake to cancel the authorized capital stock of the corporation or any part thereof simply because it was proposing to issue the same for an unauthorized purpose.

[14] The eighth and ninth assignments complain of the refusal of the court to cancel the stock issued to Leonardt, Martinez, and Courchesne, in payment for the Courchesne property upon which defendant company's plant in El Paso is situate, which property was conveyed to the company and stock issued in payment therefor in pursuance of the promotion contract made on April 10, 1907, between Leonardt, Martinez, Courchesne, and Aman Moore, referred to in the tenth paragraph of the trial court's findings of fact. It is further complained in these assignments that recovery should have also been had against Leonardt, Martinez, and Courchesne for the dividends which had been paid upon

such stock. These assignments are predicated upon the theory that there was a large secret profit made out of the sale of the Courchesne property to the company by the parties mentioned, which profit was represented by the shares of stock of the cement company given in payment for the property; that, by reason of the fiduciary character of the parties, they must account to the company for such profits. We concur in the trial court's conclusion of law that, if any right to such relief had ever existed, the same was barred by the four years' statute of limitation.

The trial court made the following findings: That such stock had been issued prior to January 1, 1908. The suit was filed July 6, 1915. That the plaintiffs all acquired their stock subsequent to the 1st day of November, 1909. That the promotion agreement between Aman Moore, Leonardt, Martinez, and Courchesne was open and notorious, and that no attempt was made to conceal the terms thereof, and that plaintiffs were guilty of laches in waiting eight years after the issuance of such stock before instituting this suit. That said purchase and sale of the Courchesne property was made in good faith, and was not fraudulent in law, and that action to cancel said stock or to recover dividends thereon is barred by the four years' statute of limitation. That the purchase price and amount of stock paid by the Southwestern Portland Cement Company, in consideration of the conveyance to it of the Courchesne property having been placed of record on the minutes of the corporation at the time of the transfer, as well as having been placed of record in the deed records of El Paso county, Tex., and notice thereof having been given at each annual stockholders' meeting of the stockholders of the corporation, in the financial statement rendered to such meetings, the plaintiffs were guilty of laches in not proceeding to question or cancel such issue of stock for eight years after the date of such issuance. The correctness of these findings of fact is not challenged, and the evidence abundantly supports the same. There was neither allegation nor proof by the plaintiffs that they ever made the slightest inquiry, at the time they bought their stock, or afterwards, about the price paid by the Southwestern Portland Cement Company for the land purchased by it; but, on the contrary, Mr. Binford testified the price to be paid for the Courchesne property was discussed among the organizers of the corporation, including plaintiff Neff, and the testimony showed that all of the other plaintiffs became stockholders long subsequent to the transaction, and without making any inquiry as to the price paid for the property, though the information was accessible to them in the office of the county clerk.

In view of the unchallenged findings of the trial court and the other facts indicated, we think that the plaintiffs were charged with full knowledge of all the facts and were guilty of laches and barred by the four years' statute of limitation. McCord v. Nabours, 101 Tex. 494, 503, 109 S. W. 913, 111 S. W. 144; Fox v. Robbins, 62 S. W. 815; Taylor v. Holmes, 127 U. S. 489, 8 Sup. Ct. 1192, 32 L. Ed. p. 179; Alexander v. Searcy, 81 Ga. 536, 8 S. E. 630, 12 Am. St. Rep. 337; Hill v. Atlantic N. C. R. Co., 143 N. C. 539, 55 S. E. 854, 9 L. R. A. (N. S.) 606. See, also, note 97 Am. St. Rep. p. 49, and Ruling Case Law, vol. 7, p. 331, par. 297.

[15] The tenth assignment is that the court erred in refusing to require the directors of the cement company to ascertain the funds on hand and declare dividends for the reason that there would be a large surplus on hand from the earnings of the company and the recovery for the company's benefit which is to be had in this proceeding. The proposition urged in support of this assignment is:

"A court of equity will interfere and require the board of directors to declare dividends out of accumulated surplus, where the board appears to be acting in bad faith."

Under our view of this case. the only moneyed recovery which can be had is against Leonardt and Martinez for $7,200 adjudged against them in the fourth and fifth paragraphs of the lower court's decree. This will not materially increase the company's surplus. As to the accumulated surplus on hand, there is no evidence that the board of directors is acting in bad faith in refusing to disburse the same in dividends. The tenth assignment is therefore overruled.

Under the views expressed above, it is apparent that the only error presented is raised by the defendants' seventh, eighth, ninth, and tenth assignments, which complain of the sixth and seventh paragraphs of the court's decree. The judgment will be reformed so as to deny the relief granted in said paragraphs, and, as reformed, will be affirmed. Three-fourths of the costs of appeal shall be taxed against the plaintiffs, and one-fourth against Martinez.

Reformed and affirmed.

HARPER, C. J. I do not concur in the majority opinion in the above case for the following reasons:

Under the pleadings and evidence, the following are the subject-matters made the basis of this action, and they should be determined for or against the plaintiffs in accordance with established rules of law and practice:

It is charged that Courchesne, Martinez, and Leonardt were the original promoters of the corporation, and, as such, made a secret profit upon the lands upon which the El Paso plant is located, in that it was worth not exceeding $50,000 and was turned into or deeded to the corporation for a consideration of $300,000 and the stock of the corporation issued to said promoters for that amount; therefore the stock issued to each in excess

of the actual value of the land was issued to them without consideration and should be recalled, and that the corporation should have judgment for all moneys paid to them as dividends thereon.

The admissions of said defendants are that the charge is true, except, they answer, that such claim is barred by the statute of limitations; that a full and fair report of the matter was made to the stockholders and same was approved; and that the lands were in fact worth $300,000.

There is evidence that the stockholders, at the time of the purchase, had a chance to know the facts; but it is denied that they, in fact, knew them, and the subsequent purchasers of stock testify that they knew nothing about the transaction.

It will be noted (in the statement of the majority opinion) that the only question submitted in this respect was, "What was the actual value of the land conveyed?" The questions of secret profits and limitations were not submitted to the jury. Under the pleading and facts, Courchesne, Martinez, and Leonardt were promoters and, as such, they were required by law to act in good faith, one with another and to proposed investors, and such special profits as they reserved to themselves must not have been secret. Hall v. Grayson County National Bank, 36 Tex. Civ. App. 317, 81 S. W. 762; Tenison v. Potton, 95 Tex. 284, 67 S. W. 92; Yale Gas Stove Co. v. Wilcox, 64 Conn. 101, 29 Atl. 303, 25 L. R. A. 92, 42 Am. St. Rep. 159.

If this excess issue of stock to these promoters was secretly manipulated, the corporation, at the suit of these plaintiffs, as stockholders, should recover it back with dividends paid thereon, unless precluded by laches. Limitation begins to run only when the stockholders having full knowledge of the facts delay bringing suit for four years. Fox v. Robbins, 62 S. W. 815.

In my opinion, the judgment in both respects should have been for the plaintiffs under the evidence, but, if not, then the trial court nor this court, where there was a jury, should determine them.

The second question is plaintiffs' charge that the officers and directors are unlawfully dissipating the assets of the corporation with ulterior motives, and the prayer is that an accounting be had to the end that such moneys be returned into the corporation and dividends be declared. As to this, the plaintiffs were entitled to a full hearing. The stockholders are entitled to have access to the books of the corporation, that they may investigate such affairs, and if the directors are refusing to declare dividends, and such refusal amounts to an abuse of their discretion, the court should interfere and compel a distribution. Purdy's Beach on Private Corporations, vol. 2, § 457. This the trial court refused to consider, and plaintiffs, by their ninth assignment, sufficiently raise the question to require a reversal of the case.

The next question raised by the plaintiffs' first assignment, and others, upon which I do not agree with the majority, is the purchase of the Victorville property from Leonardt, president of the corporation, and issuing in payment therefor 750 shares of stock, when in fact the evidence shows that it cost him not more than $34,000, and the jury found its actual value to be $35,000. As to this, the petition charges that the purchase was made with the fraudulent purpose of depreciating the value of the general stock, etc.

Officers and trustees of corporations may sell their property to the corporation where the transaction is fairly and openly entered into for such price as may be agreed upon. Pneumatic Gas Co. v. Berry, 113 U. S. 322, 5 Sup. Ct. 525, 28 L. Ed. 1003; 18 Ann. Cas. 354.

"But courts will restrain the consummation of contracts between directors and the company which show upon their face to be fraudulent or which may be proven to be to the satisfaction of the court and jury, and the fact that a majority of the stockholders have given their consent to the transaction will not deprive the minority stockholders of the right to restrain the fraud by injunction." Purdy's Beach on Private Corporations, vol. 2, § 745.

The public is interested in the question of inflated or watered stocks, of corporations, and it seems to me that the facts here strongly indicate, if they do not conclusively show, such fraud as to require the court to issue the writ prayed for. Again, the question of fraud in this transaction was not submitted to the jury, but must of necessity have been by the court and determined in favor of the plaintiffs, else there is no foundation for the judgment entered. The decree canceled the stock in excess of $35,000, in other words, 400 shares, and now, under the statute, it will be by this court presumed in favor of the judgment that the court determined the issue in favor of the judgment entered. So if there was fraud (the trial court must have so found) it vitiated all of the stock issued and not only a part of it.

I am of the opinion that this purchase is in line with that passed upon in the case of Gamble v. Queens County Water Co., 52 Hun, 166, 5 N. Y. Supp. 124; Id., 123 N. Y. 91, 25 N. E. 201, 9 L. R. A. 527, where it was held "that to issue $50,000 of stock and $60,000 bonds to raise money for the purchase from one of its trustees of property worth $65,000, the corporation stock at the time being at par, was sufficient evidence of fraud to authorize an injunction restraining the corporation from carrying out the resolution," and the court held that it was immaterial that a majority of the stockholders consented to the arrangement. To the same effect is Fogg v. Blair, 139 U. S. 118, 11 Sup. Ct. 476, 35 L.

Ed. 104. See, also, Lockney State Bank v. Martin, 191 S. W. 796.

But if we would not be justified in holding that the transaction is fraudulent as a matter of law, surely the case must either be reversed and remanded for a new trial upon the assignments raising the question, or else here rendered for the plaintiffs. My view is that the assignments are sufficient to call for a reversal only upon this question, because the evidence is such that it ought not to be determined by this court and is such as that, upon another trial, the jury might find for either party.

The defendants' eleventh and twelfth assignments complain of the judgment in favor of plaintiffs and against Martinez and Leonardt for back salary. The majority opinion sustains the judgment for the corporation upon the ground that "the evidence is insufficient to show that there was an implied contract to pay salaries to them for the year 1914." The plaintiffs seek to recover this money back from the defendants; therefore have the burden of proving that there were no services rendered, or, if services were rendered, that they were of no value, or, if valuable services were rendered, they must prove that there was neither express nor implied contract to pay for them. The question here is: Was there any affirmative evidence of the necessary fact or facts indicated next above to support the judgment? After a most careful reading of the statement of facts, I fail to find such evidence; therefore conclude that the judgment for this amount should not be sustained.

Both parties have appealed from the judgment entered by the trial court in this case, and I think both have pointed out reversible error. I am not unmindful of the fact that the Supreme Court, by rule 62a (149 S. W. x), has given us permission, if they have not commanded us, to determine whether a case shall be reversed upon errors of law in the course of the trial and, though it may have so done, charged the appellate courts not to reverse, if upon consideration of the merits of the case we shall have determined that no improper judgment has been rendered; but I am of the opinion that this rule should rarely, if ever, be invoked in support of appellate court opinions, because to determine the merits of the case here is to usurp the functions of the trial judge and jury, and I am of this opinion, notwithstanding the fact that the Legislature has by article 1984, R. S., in cases submitted upon special issues, as this one was, charged us to presume that, when an issue is not submitted and not requested, the trial court found in favor of its judgment, if there be evidence to support such findings, for both of the rules above quoted operate to divest the trial court of functions which are peculiarly and properly theirs in the administration of our laws. Upon the trial of this case, five special is-

sues were submitted, and not one of them requested a finding upon the merits of any issue made by the pleadings and evidence. Take, for instance, the issue of recovery of back salary, of which defendants complain upon this appeal, the only question submitted concerning it is: "Did the board of directors give Leonardt and Martinez back salary?" Not controverted, but admitted in the pleadings. So, I think, considering the record as a whole, together with the assignments of the parties, some of which are good, the cause should be reversed and remanded for a new trial upon all the issues raised by the pleadings, with an opinion so framed as to fully advise the counsel and the court of the rules of law applicable thereto, for, in my opinion, it has not so been tried. I therefore enter my dissent.

When the above dissent was penned, I thought, from the length of the majority opinion, that it exhausted all there was to say in its favor, but since there has been born into it page 1125, which asserts that, this being a foreign corporation, the laws of West Virginia govern in the issuance of its capital stock, and that, "in the absence of fraud, the value of the property purchased is conclusive," and further asserts that "the minority opinion presumes that there was fraud in the transaction," and further calls attention to the fact that the findings of the trial court do not show that he found that there was fraud in the sale by the president of the corporation of the Victorville plant, I feel constrained to add the following:

In my opinion, the principles of law invoked above are not peculiar to any particular state, but are of universal application. The above opinion simply means, if it needs explanation, that the question in these transactions—the sale by the promoters of the El Paso lands and the sale to the corporation of the Victorville plant—is: Was there fraud? Conceding that the trial court did not find fraud in his findings of fact, to enter the judgment canceling the 400 shares of stock issued for the Victorville plant, he must necessarily have found that fraud actually existed. This being so, to make a separate finding of facts which finds to the contrary, or fails to find in line with the judgment, for which finding of facts there is no express or implied statutory authority, where the case is tried by jury, should in no sense authorize this court to determine the question, especially in view of the fact, as I view the record, that there is evidence of fraud, and in view of the further fact that the question has not been submitted to the jury. I do not think the above dissent is susceptible of the construction that it presumes fraud. It was not so intended. But I simply intend to say that from the whole of the record, as attacked by the assignments of error, this case should be tried again and the questions determined by the trial court and not by the appellate court.

I therefore dissent to the things asserted on page 1125 of the majority opinion.

### On Rehearing.

HIGGINS, J. [16] Plaintiffs, in their motion for rehearing, vigorously attack the action of the majority in sustaining the defendants' seventh, eighth, ninth, and tenth assignments, which complained of that portion of the court's decree which, in effect, canceled 400 shares of the defendant corporation's common and preferred stock, which was a part of the 750 shares of stock of the par value of $75,000, issued to Leonardt in payment for the Victorville property. This property cost Leonardt about $35,000, and the jury found that to be its value. The plaintiffs assert that the president of a corporation, while president, cannot acquire property for $35,000 and then sell it to the corporation for $75,000 without revealing to the corporation the price he had paid for same. None of the authorities cited by plaintiff sustain such a broad assertion. Of course, the president of a corporation occupies a fiduciary capacity, and, where he personally acquires property with the view of disposing of it to the company and does do so, he becomes liable to the company for any profit which he may make out of the transaction, unless he makes a full disclosure and the entire contract is open, fair, and honest. There is nothing in the record to indicate that Leonardt acquired the Victorville property for the purpose of disposing of it to the cement company. He acquired it for purposes of his own some time before it was sold to the defendant corporation. The stockholders decided to acquire the property after full discussion and investigation. Leonardt's stock was not voted at the meeting when the decision to purchase was made. The great preponderance of the testimony shows that the property was worth very much more than $75,000. Leonardt testified and it is not contradicted that he had been offered $75,-000 for a one-half interest in the property and declined it because he desired his company to get the property. He seems to have acted in perfect good faith with his company. In our original opinion, it was said that the price which Leonardt paid for the property was disclosed at the stockholders' meeting when the purchase of the property was under consideration. This statement was made upon the faith of the statement subjoined to the first proposition under defendants' seventh assignment. The correctness of defendants' said statement was not contested by plaintiffs, and, under rule 41 governing the Court of Civil Appeals (142 S. W. xiv), we were authorized in assuming that the statement was correct. But in the motion for rehearing, plaintiffs challenge this court's finding and say that the price which Leonardt had paid for the property was not disclosed at such stockholders' meeting, and that they remained in ignorance thereof. Under our view of the case, we think this is immaterial; that under the facts detailed above and in the original opinion, the entire transaction was free from fraud, actual or constructive; that Leonardt was guilty of no breach of trust, and did not become liable to the corporation for the profit which he made on the sale of the Victorville property. 10 Cyc. 704–797.

[17, 18] In their motion for rehearing, plaintiffs also complain of the action of this court in according any consideration to the findings of fact filed by the trial court. They made a written motion that the trial court state in writing and file findings of fact such as it found in addition to the facts found by the jury. But they now say they abandoned this motion and that the findings are a nullity, since the case was tried before a jury. We finding nothing in the record to show that the motion was abandoned. And in a case submitted upon special issues, the majority thinks it not improper for the trial court upon request to file findings of fact which definitely show what facts were found by it in addition to the jury's findings and upon which the judgment is based. The Supreme Court seems to have recognized the propriety of so doing. Arkansas, etc., v. Bank, 104 Tex. 187, 135 S. W. 529. It is true the court cannot be required to make up and file such findings (Railway Co. v. Stevens, 185 S. W. 390; Jones v. Edwards, 152 S. W. 727), but we think due consideration can be given to such findings made in response to a request therefor. Such findings are pertinent as affirmatively evidencing the facts which the court did in fact find in addition to those found by the jury. By virtue of article 1985, R. S., upon appeal, issues of fact not submitted to the jury and not requested to be so submitted are to be deemed as found by the court in such manner as to support the judgment, provided there be evidence to sustain such a finding. In view of this statute, every issue in this case found by the trial court must be deemed to have been so found. Plaintiffs did not in their brief point out or complain of a single finding made by the trial court as having no evidence to support it. Neither do they do so in their motion for rehearing, and we will assume that every finding of fact made by the court below had some evidence to support it.

All other questions presented in the motion were fully considered, and the views of the majority sufficiently indicated in our original opinion.

The motions for rehearing of both plaintiffs and defendants are overruled.