**ADAMS et al. v. FARMERS GIN CO.**

**No. 1735.**

Court of Civil Appeals of Texas. Eastland.

March 4, 1938.

D. J. Brookreson, of Benjamin, and Ratliff & Ratliff and Davis & Davis, all of Haskell, for appellants.

B. C. Chapman, of Haskell, and Coombes & Andrews, of Stamford, for appellee.

GRISSOM, Justice.

Plaintiffs C. A. Adams et al., stockholders of the Farmers Gin Company, a corporation, sued said company for debts alleged to have been incurred as hereinafter shown. It was alleged that defendant's gin was destroyed by fire in December, 1925; that plaintiffs were owners of certain shares of stock in said corporation; that on May 1, 1926, " * * * there was called a meeting of the stockholders in a manner provided by the Constitution and by-laws of said corporation, which meeting was called for the purpose of determining whether or not the corporation should be dissolved and the assets of said corporation distributed and divided among the stockholders of said corporation according to the shares of stock held by them, or whether or not they should continue in business and erect a new gin;

\* \* \* and all officers and directors of said corporation also present. \* \* \*

"That at said time and place 'it was determined *by the stockholders* at said meeting that the company owned and had in its possession at said time monies and other assets sufficient to pay all of its outstanding indebtedness, to apply $10,000 cash in dividends, and there then remained sufficient amount to make each of the shares of stock that had been so issued by the company of the value of $125.00, including those shares now owned by these plaintiffs; that the said stockholders at said meeting then considered whether all of such assets be distributed among the said stockholders, and that the said company dissolve, liquidate, and cease business or whether it should buy new machinery, erect a new gin and continue in the ginning business, and it being proposed that each of the stockholders so owning said $125.00 dividend, which had *not* been distributed, loan such amount to the company and permit the 'company to use same for the purpose of so erecting and equipping a new gin, and at said time each stockholder was offered the opportunity to take and receive his said sum of $125.00, or to loan the same to the company for said purpose, and these plaintiffs and those under whom they claimed as transferees of said stock, elected to lend their $125.00 per share to the said company, and upon resolution duly offered and motion made, and duly carried, a contract was then and there made and entered into by and between these plaintiffs, and the defendant and those stockholders under whom they now claim, which was evidenced in writing in the form of a resolution and duly entered upon the Minutes of said corporation under and by which each stockholder, so permitting the said company to take and use his respective $125.00, should be repaid such sum with 10% interest thereon as soon as the revenues arising from the operation of such new gin, when so erected, had paid off and discharged all other indebtedness then owing by the said company, together with the operating expenses of such gin, and that no dividends should be declared upon any *outstanding* stock until and after such indebtedness had so been paid by the said company, defendant herein."

Plaintiffs sought recovery of the unpaid portion of $125 for each share of stock owned by plaintiffs, with interest at the rate of 10 per cent. per annum from May 1, 1926.

In the alternative, plaintiffs alleged, in the event it be determined that the facts alleged, as above set forth, did not constitute "a loan of said money," that plaintiffs "are entitled to have the said written agreement enforced as a binding contract by and between them and the defendant herein, and that they have judgment against said defendant for the amount of said sum of money with interest thereon at 10% as provided in said written agreement."

It was then alleged that in "accordance with said agreement" the directors did build a new gin "using the assets of the corporation in constructing the same, including said $125 per share." Plaintiffs alleged that in 1933 defendant paid to its stockholders, in accordance with the alleged agreement, $30 per share, and in 1934, $41.-25 per share. That thereafter no such payments were made, although in 1935, the defendant earned enough "to pay its operating expenses and all outstanding indebtedness due by it, and have remaining on hand a sufficient sum to pay the remaining portion of the above said indebtedness." (The allegations contained in the last two sentences were supported by the evidence.) Plaintiffs alleged that defendant "unlawfully" paid out of its net earnings approximately $2,600 "in the form of bonuses of so much per bale to those customers who had baled (ginned) cotton with it. \* \* \*"

The defendant's charter provided: "The association is formed for the purpose of purchasing and maintaining a cotton gin or gins and the ginning and preparing for market of cotton and cotton seed. \* \* \*" Also, "The business of the association shall be transacted by five (5) directors \* \* \*," and that the capital stock was "$15,500 to be divided into 620 shares of the par value of $25.00 each."

The evidence authorized, if it did not compel, a finding by the trial court of the following facts: That from the time of its incorporation until the gin was destroyed by fire, all the dividends paid were "bale dividends."

"Q. Anyway, from the time you incorporated up to the time of this fire, all the dividends you had paid were bale dividends? A. Yes, sir. \* \* \*

"Q. Now, this corporation was organized on a bale dividend basis, wasn't it? A. It was to be paid on a bale dividend, yes sir."

After May 1, 1926, cash payments aggregating $71.25 per share of stock were paid

to the stockholders. Then the company returned to the "bale dividend" basis. By "bale dividend" was meant that to the stockholders who ginned with the defendant there was returned approximately the net profit acquired by defendant in ginning the stockholders' cotton. The result of payment of "bale dividends" was that a stockholder who did not gin his cotton with defendant received no dividend on his stock, even if a net profit was earned by the defendant. In May, 1926, after the destruction of the gin by fire, in December, 1925, the stockholders held a meeting, at which the officers and directors were present, for the purpose of determining whether the corporation should be dissolved and its assets divided among its stockholders, or the gin rebuilt and they continue in the cotton ginning business. At such stockholders' meeting it was decided, if the corporation were dissolved and its assets divided, the stockholders would be entitled to receive approximately $125 for each share of stock. However, the stockholders voted to rebuild the gin and continue the ginning business. They did not vote to dissolve the corporation and divide its assets. The then assets of the gin apparently consisted of the insurance collected by reason of the burning of the gin, amounting to $10,000 (then in the bank to the credit of the defendant) and the real estate upon which the gin had stood. Out of the 620 shares of stock provided for by the charter there had been issued between 100 and 120 shares and the balance of approximately 500 shares was held as treasury stock. At such meeting the stockholders voted "to loan" their $125 (what they estimated they would be entitled to for each share of the stock if the corporation were dissolved and its assets divided among the stockholders) to the gin company. (It was understood that the insurance money was insufficient to pay for a new gin and that this money was to be used as a first payment for their new gin plant, and the company would issue notes, secured by a mortgage on the gin, for the balance of the purchase price.) The stockholders understood that their so-called "loans" of $125 for each share of stock owned by each stockholder was to be repaid, after the gin plant was paid for, with 10 per cent. per annum interest on said "loans." There was testimony to the effect that at said stockholders' meeting it was agreed that no dividends were to be paid until their "loans" were repaid. (The allegations were that no dividends were to be declared upon any of the then *outstanding* stock until all debts were paid.)

As illustrative of the situation we quote from the testimony as follows:

One of the plaintiffs, Mr. Turner, testified:

"Q. * * * The only consideration which the Farmers Gin Company got for this debt of $125 was your allowing them the use of the insurance money to rebuild the gin; that's right, isn't it? A. How's that?

"Q. The only consideration the corporation got for this contract to pay $125 per share as an indebtedness was the allowing by the stockholders of the insurance money to be used for the rebuilding of the gin; that's right, isn't it? A. Well, I don't know whether I understand altogether what you mean.

"Q. Well, did they get anything else out of it? You didn't put in any additional money to that, did you? No sir, I don't think so.

"Q. All the money then that you put in, or any other stockholder put in was what interest he had in the insurance money, isn't it? A. That's my understanding."

Mr. Trimmier, a plaintiff, testified:

"A. * * * the intention of the meeting was, as I recall it, was whether or not they would continue in the gin business, or whether they would dissolve and divide up their money at that time.

"Q. At that time, did you ascertain the amount that would be coming to each share holder? A. Approximately $125.00, to be exact $124.65. That's my understanding.

"Q. What was finally decided to be done? A. Well, they placed it to a vote and it was decided to continue on in the gin business, and they placed this money back in the gin business as a loan.

"Q. As a loan? A. Yes sir.

"Q. Were you a stockholder at that time? A. Yes sir.

"Q. Were you a director at that time? A. Director and a stockholder both. * *

"Q. Well, when was this to be paid back? A. Well, it was to be paid back, as I understood it, after the mortgage holders received their money, after the new gin was bought. Of course, there wasn't enough insurance to cover the price of a new gin and it was to be paid back after the other indebtedness on the gin was paid.

"Q. Was there any interest? A. Ten per cent interest.

"Q. Well, was that resolution adopted and entered on the Minutes? A. I think so. * * *

"Q. What provision was made, if any, with reference to circulating stock, that treasury stock never had been circulated? A. My understanding was the stockholders, at that time, at the time the first gin was burned, the gin site and the insurance money they collected was theirs and they was the ones that would share in the loan. In other words, the ones loaning the money, the way I understood it; I don't remember just what was said, what distinction might be made in other stockholders coming in later, but the understanding. with me, and I think they all understood it the same, that the ones that bought stock from there on out, didn't share in the fund at that time. * * *

"Q. All the corporation got for an agreement to pay was a retention of what it already had; that's correct isn't it? A. If I understand your question right, the board and the officers assured them of this money back with ten per cent interest, is my understanding.

"Q. All the corporation got was just simply that it retained what it already had? A. It taken this money and placed it in machinery.

"Q. It already had that, didn't it? Wasn't that insurance money paid to the corporation? A. Yes, it was placed in the bank.

"Q. To the credit of the corporation, and was to the credit of the corporation at the time you agreed on the value of your stock? A. The stockholders was entitled—

"Q.—That's what we might argue about, but anyway that money was to the credit of the corporation? A. Yes sir.

"Q. It wasn't to the credit of any individual stockholder, it was to the credit of the corporation in the bank? A. Yes, it was to the credit of the corporation."

The witness further testified that at a similar meeting in 1934 a motion was made and carried to the effect "that instead of paying this balance on the basis of * * * $125.00 per share" the defendant "would pay instead on a bale dividend basis."

The trial was to the court. The judgment in so far as it is material here was that plaintiffs take nothing. Plaintiffs have appealed.

The assignment of error is that the court erred in failing and refusing to render judgment for plaintiffs under the pleadings and evidence.

Appellants' two propositions are as follows:

"Where, as in this case, a *stock* dividend has been declared by resolution, such declaration of dividends creates a debt against the corporation in favor of each stockholder to the amount due him as his prorata share.

"Where, as in this case, the constitution and by-laws of a corporation contains the following language, 'There shall be no dividends declared by this corporation until all outstanding debts and running expenses have been paid, including the stock of the individual stockholders, which shall be paid with 10 per cent interest from date of stock issue' then each of said stockholders is entitled to payment of his share of stock as, if, and when all outstanding debts and running expenses have been paid."

■ There are neither findings of fact nor conclusions of law, nor request therefor, in the record. We call attention to the established rule of law that, under such circumstances, an appellate court is required to presume that the trial court found every fact finding support in the testimony in favor of the judgment.

Plaintiffs' pleadings, at least primarily, are based upon the theory of a loan by plaintiffs to defendant. That is, that a cash dividend was declared and that instead of actually going through the form of paying the dividend and lending it back to the defendant, that such was the effect of the agreement. Possibly, the alternative pleading might be construed as alleging a cash dividend to be paid in the future upon the happening of certain contingencies, which were alleged to have happened. The brief, apparently (and certainly as to the first proposition), treats the asserted right to recover as upon a declared stock dividend.

■ We shall first consider whether the transaction was a loan. Article 1348, R.S.1925, provides:

"No corporation * * * shall create any indebtedness whatever except for money paid, labor done * * * or property actually received reasonably worth at least the sum at which it was taken by the corporation."

It is evident the plaintiff stockholders never acquired the $125 per share alleged to have been loaned by them to the defend-

ant. The good faith mistake of the stockholders and the confusion in this case seems to have resulted from their failure to distinguish between the situation of parties dealing with each other as individuals or members of a partnership, and parties dealing with a corporation in which they own shares of stock. A corporation is a legal entity distinct from its stockholders. The assets of the defendant corporation in May, 1926, appear to have consisted of $10,000 collected as insurance after the gin was burned, and the land on which the gin had been located. Plaintiffs' allegation that defendant at the time of the stockholders' meeting owned and had in its possession moneys and other assets sufficient to pay all outstanding debts, apply $10,000 cash to dividends and then have sufficient assets remaining to make each share of stock of the value of $125 (if such was the meaning of plaintiffs' allegations), are not supported by the evidence. The money was in a bank to the credit of defendant. The title to the realty was in the defendant. These assets were the property of the corporation, not its stockholders. True, the stockholders could have dissolved the corporation and divided its assets among the stockholders. Plaintiffs pleaded and proved that they did not do so. Therefore, plaintiffs did not acquire the $125 per share in that manner.

Were the plaintiffs entitled to the $125 per share, which they claimed to have loaned to the defendant, as a dividend? We think they were not, for reasons hereinafter stated. The evidence shows, we think, conclusively, if not, it certainly sustains the presumed finding of the trial court that the facts were as hereinbefore stated.

The right of management of the business was vested in the directors, not the stockholders. If the stockholders did not approve of the management of the business by the directors, they could, in the prescribed manner, at the regular time, elect other directors. The evidence shows that if the stockholders had acquired the $125 per share, the entire assets of the corporation would have been exhausted. This cannot be done, except upon dissolution of the corporation. Plaintiffs cannot receive the value of their stock in the corporation, or acquire a debt for that amount, and still own the stock. In re Phoenix Hotel Co. of Lexington, Ky., 6 Cir., 83 F.2d 724. Their attempt to fix a debt against the defendant corporation based on the stockholders' estimate of the value of the corporation's assets and a division thereof by the number of shares could not operate to create a debt. 10 Tex.Jur. § 241, p. 873. Was there a dividend, either in stock or cash, legally declared? The directors, not the stockholders, are authorized to declare a dividend. "But it has been held that when the stockholders, including all the directors of a corporation, meet and agree to a division of the *profits,* and such agreement is *executed,* the corporation is bound thereby." 14 C.J. § 1227, p. 807. Assuming that the meeting in May, 1926, was more than a stockholders' meeting, and was also a directors' meeting, because, being stockholders, the directors were present, still, the agreement interpreted by the plaintiffs as in substance a payment to them of $125 which they purported to then "loan" to the corporation was not out of "profits." According to the testimony, it would have taken the entire assets of the corporation to pay the $125 per share. 10 Tex.Jur. § 302, p. 952.

Article 594, R.S.1925, is as follows: "It shall be unlawful for any concern included in this title to declare, issue, or pay a *cash* dividend to its stockholders or any of them, out of any funds other than the *actual earnings* of such company in the course of its operations, except upon the lawful liquidation thereof."

This statute precludes the idea of a cash dividend being either declared or paid.

Article 1347, R.S.1925: "If the directors of any corporation shall knowingly declare and pay any dividend when the corporation is insolvent, or any dividend the *payment of which would render it insolvent,* they shall be jointly and severally liable for all the debts of the corporation then existing."

Article 12, section 6, Constitution of Texas, provides: "No corporation shall *issue stock* or bonds except for money paid, labor done or property actually received, and all fictitious increase of stock or indebtedness shall be void."

"Dividends and profits are not synonymous terms. The profits of a corporation are not dividends until so declared or set apart by the corporation so as to become the property of the stockholder. In other words, until dividends are declared, the surplus profits of a corporation are part of its assets, and do not belong to the stockholders individually." 14 C.J. pp. 798, 799, § 1208.

"With the exception of dividends in liquidation dividends can be declared and paid out of net profits only, or conversely stated, when the payment thereof does not impair the capital stock of the corporation. Nor can a corporation declare and pay a dividend when it is insolvent, or when the payment thereof would render it insolvent." 14 C.J. p. 800, § 1209.

See, also, Jewell v. Sal-O-Dent Laboratories, Tex.Civ.App., 69 S.W.2d 544, 546, writ ref.; Bryan v. Sturgis Nat. Bank, 40 Tex.Civ.App. 307, 90 S.W. 704, writ ref.; Southwestern Portland Cement Co. v. Latta & Harper, Tex.Civ.App., 193 S.W. 1115; Yeaman v. Galveston.City Co., 106 Tex. 389, 167 S.W. 710, Ann.Cas.1917E, 191; Duncan v. Ponton, Tex.Civ.App., 102 S.W.2d 517; McAlister v. Eclipse Oil Co., Tex.Sup., 98 S.W.2d 171; Moroney v. Moroney, Tex. Com.App., 286 S.W. 167; Articles 594, 1308, 1314, 1326, 1329, 1330, 1348, R.S.1925; Article 1078, P.C.1925; 14 C.J. §§ 386, 1207, 1210; Id. § 815; 10 Tex.Jur. 686, 952.

■ By virtue of the provisions of article 594, the declaration or payment of a $125 per share cash dividend, since it could not have been made out of the "actual earnings * * * in the course of its operations" but would have been out of, and in fact would have exhausted, the capital assets of the corporation, would have been "unlawful." It would have also had the effect of rendering the directors liable as provided by article 1347.

Article 12, section 6, of the Constitution of Texas, quoted above, is, we think, a complete answer to plaintiffs' proposition No. 1, that is, their contention that a stock dividend was declared. A finding that a stock dividend was declared would not have found support in either the pleadings or evidence. The charter fixed the amount and par value of the stock. No action for the creation of preferred stock was taken. No amendment of the charter and the approval and filing of same by the Secretary of State, as required by article 1314, is shown. Plaintiffs paid no money and performed no labor and the corporation received no property from them as a legal basis for the issuance of stock. No net profits are shown to have been earned and unpaid on May 1, 1926. As heretofore stated, the corporation then held and owned the insurance money and all other assets. There was no transfer or conveyance of property, either actually, or in legal effect, from the stockholders to the corporation as a lawful basis for a debt or for stock of the corporation. An agreement to pay the value of all the assets of a corporation to its stockholders cannot be enforced as a declared dividend or otherwise, except upon dissolution of the corporation. Dividends may be paid out of profits but not out of the capital assets of the corporation. (Italics in this opinion are the court's.)

We have carefully studied the record. Applying the facts disclosed by this record to the law as evidenced by the authorities cited, we think the trial court was authorized, if not bound, to find and conclude that there was no legal declaration of a dividend, either in cash or stock, in May, 1926, and no debt by the corporation to its stockholders resulted from the action disclosed. The correct judgment was rendered and it is affirmed.